COMMONWEALTH *vs.* STEPHEN P. BUONOPANE.

Suffolk. January 24, 1980. — May 6, 1980.

Present: PERRETTA, ROSE, & KASS, JJ.

*Practice, Criminal,* Disclosure of evidence. *Evidence,* Failure to produce witness. *Witness,* Police officer.

Neither dismissal of an indictment nor a new trial was required by a witness's acknowledgment at a criminal trial that he had testified falsely at the defendant's probable cause hearing where the issue about which the witness had lied was not crucial or material to the determination of probable cause and where there was no evidence to support a finding that the Commonwealth had deliberately suppressed exculpatory evidence. [653-658]

At a criminal trial, the judge did not err in permitting the prosecutor to refer in his summation to the defendant's failure to call a police officer who had witnessed the crime where defense counsel had previously commented in his closing on the Commonwealth's failure to call the officer and where the judge properly instructed the jury that an adverse inference against either side could not be drawn from a failure to call a witness who was equally available to both. [658-659]

INDICTMENT found and returned in the Superior Court on March 8, 1978.

The case was tried before *Doerfer, J.*

*Joseph J. Balliro* for the defendant.

*Timothy P. O'Neill,* Assistant District Attorney (*M. Ashley Brown,* Special Assistant District Attorney, & *Sharon Myers,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

PERRETTA, J.   The defendant was convicted of manslaughter on an indictment charging him with the first degree murder of Robert Sultis. He appeals and assigns two errors in his trial. G. L. c. 278, §§ 33A-33G. He argues that the Commonwealth withheld from him exculpatory evidence which was material to his defense and that the prosecutor made an improper reference in his summation to the defendant's failure to call a particular witness. We affirm the judgment.

We summarize briefly the evidence presented at the trial. In the early morning hours of January 13, 1978, Robert Sultis and his friend Hawkins were at the Fan Club, a lounge on Warrenton Street in Boston. They had gone there together but separated upon their arrival to mix and socialize with other patrons. Sultis was at the bar, and two or three other patrons observed him reach over the bar and into the open drawer of the cash register, take some money from it, and leave quickly. They alerted the bartender to what they had just seen, and he called out to other employees telling them to stop the man leaving. The defendant, a doorman at the club, along with one or two other employees, gave chase to Sultis. They apprehended him a short distance up the street from the club, and they milled about him demanding he return to the club with them "to straighten the matter out." They were seen by Hawkins, who had left the club and was farther down the street in his car ready to drive away from the area. He rapidly backed his car up the street towards the group, swerving and causing the members to scatter slightly. When he stopped the car, Sultis came around to the front passenger side and slowly got into the car. The defendant followed him while the others stood to the rear of the car. The defendant then ap-

peared partially in the car struggling with Sultis, whom he was trying to pull out of the car. Hawkins got out of the car and approached the men standing behind it, and Sultis slid over to the driver's seat. At this moment a police car containing three officers and a civilian drove by. Two of the three officers testified to their respective observations of the events which next occurred in quick succession: the defendant stepped back from the car with a gun in his hand; he fired a shot into the front seat area; and the car suddenly sped off and came to a crashing stop about a half block away. The defendant was arrested almost immediately for the shooting which caused Sultis' death. It was the Commonwealth's case that the defendant, using either his own gun or one taken from Sultis, deliberately shot him.

The defendant maintained that the shooting was an accident. He testified that as he was struggling with Sultis in the front seat of the car, Sultis produced a gun which accidentally discharged as a result of either the struggle or the sudden acceleration of the car. A knapsack containing a pellet gun was later found by the police under the front seat of the car. It is this gun, which was not the instrumentality of the crime, which gives rise to the defendant's first claim of error at his trial.

Hawkins testified at the probable cause hearing that the pellet gun was not his, that he did not know to whom it belonged, and that he had not known it was even in the car. (The car belonged to Hawkins' mother.) At the trial Hawkins did not deny that the pellet gun was his, and he admitted that he had testified to the contrary at the probable cause hearing.[1] His acknowledgement of his prior inconsistent statements prompted defense counsel to move to dismiss the indictment on two grounds. The first basis for the motion was the defendant's allegation that the Commonwealth had knowingly allowed Hawkins to testify falsely at the probable cause hearing. The judge found that neither the issue

---

[1] This admission came after persistent and exhaustive cross-examination during which Hawkins stated, "I lied, I lied."

of Hawkins' credibility nor the question of ownership of the pellet gun was crucial or material to the determination of probable cause, especially in view of the fact that two of the three police officers who had observed the shooting also testified at the hearing. See *Gerstein* v. *Pugh*, 420 U.S. 103, 121 (1975); *United States* v. *Basurto*, 497 F.2d 781, 785 (9th Cir. 1974). He correctly refused to allow the motion on that basis. The second ground for the motion was that the facts that Hawkins owned the pellet gun and that he had previously testified to the contrary were exculpatory of the defendant and should have been disclosed to him in response to his motion to be furnished with exculpatory evidence.[2] He characterized these facts as exculpatory for three reasons. Hawkins' possession of the gun on the early morning of January 13 supported the defendant's testimony that he pursued and struggled with Sultis because he had robbed the Fan Club. It further enhanced the defendant's "otherwise uncorroborated testimony" that he had taken a gun from Sultis while struggling with him. Hawkins' prior inconsistent statements were also material to the issue of his credibility.

We relate the facts testified to at the evidentiary hearing on this motion as the judge found them because our review of the transcript reveals that his findings are well warranted on the evidence elicited at the hearing. See *Commonwealth* v. *Accaputo*, 380 Mass. 435, 448 n.18 (1980) (findings of fact accepted if there is no clear error); *Commonwealth* v. *Jackson*, 377 Mass. 319, 325 (1979) (findings warranted by the evidence will not be disturbed); *Commonwealth* v. *Amazeen*, 375 Mass. 73, 77 n.3 (1978) (findings were warranted by the evidence); *Commonwealth* v. *Taylor*, 374 Mass. 426, 431 (1978) (findings accepted in the absence of clear error); *Commonwealth* v. *Burhoe*, 3 Mass. App. Ct.

---

[2] A prosecutor's failure to disclose exculpatory evidence pursuant to defendant's request is not a ground for dismissing an indictment. While the defendant's motion was mislabelled, as it related to this allegation, the judge nonetheless considered it as if it were a motion for a mistrial or a motion for a new trial.

590, 591-592 (1975) (findings supported by evidence will be sustained). Those facts were that on the morning of January 13 Hawkins gave a statement to Sergeant O'Meara in which he told him that he and Sultis had called each other "cousin" since their childhood. On January 24, 1978, Hawkins submitted to a polygraph examination, at the Commonwealth's request. During the pre-test interview, he told the examiner that on January 13, he had a pellet gun in a knapsack under the front seat of the car. At an interview with O'Meara this same day, January 24, Hawkins told him that he didn't know who owned the gun but that "it might have been my cousin's."[3] At the probable cause hearing on January 26, 1978, Hawkins testified that the gun was not his, that he didn't know who owned it, and that he had not known it was in the car. In response to one question concerning ownership of this gun, Hawkins started to say "[I]t might have been . . .," but an objection prevented his completion of the statement.

In preparing for trial, the prosecutor asked the polygraph examiner for a written report of his session with Hawkins. The prosecutor received this report on June 8, 1978, and he, in turn, gave it to defense counsel on June 12, 1978. The report contained the statement that Hawkins told the examiner during the pre-test interview that the pellet gun was his. O'Meara testified during the trial that he knew of Hawkins' admission to the examiner as of the date of the examination, January 24; however, at the evidentiary hearing O'Meara stated he did not learn of Hawkins' admission any earlier than June 12. When questioned about his contradictory testimony, O'Meara replied that he had been confused as to dates when he had given his trial testimony but that he was now certain it was no earlier than June 12. The polygraph examiner also testified at the motion hearing that on January 24, 1978, he advised O'Meara of the substance of Hawkins' examination but that he did not tell O'Meara of

---

[3] Hawkins and Sultis were not related, but they had been friends for many years and referred to each other in this manner.

Hawkins' statement concerning his ownership of the pellet gun. It was also discovered during the evidentiary hearing that on the morning of June 12 Hawkins had told the prosecutor and O'Meara that he had lied about the ownership of the pellet gun at the probable cause hearing. No one advised defense counsel of this conversation.

The judge "specifically" found that O'Meara did not know of Hawkins' prior admission of ownership of the pellet gun when he testified to the contrary at the probable cause hearing. Although Hawkins had told O'Meara that he referred to Sultis as "cousin" and had told O'Meara on January 24 that the gun "might have been" his cousin's, there was no testimony to this effect at the probable cause hearing other than Hawkins' previously described response which was cut short by an objection.[4] The judge found that Hawkins' admission to the prosecutor and O'Meara on the morning of June 12, which was not related to defense counsel, was "cumulative impeachment ammunition" at best. He concluded that there was no evidence to support a finding that the Commonwealth had deliberately suppressed exculpatory evidence. We agree.[5]

The defendant points to his general demands to the Commonwealth that he be furnished with exculpatory evidence, and seeks to invoke the holdings of *Brady* v. *Maryland,* 373 U.S. 83 (1963), and *United States* v. *Agurs,* 427 U.S. 97 (1976), as grounds for relief from his conviction. The fact that Hawkins had lied was demonstrated to the jury by the defendant. We need go no further on this point than *Commonwealth* v. *Medina,* 372 Mass. 772, 779-780 (1977): "But, even if *Brady* were thought relevant, there was nothing approaching a demonstration that earlier access would have enabled counsel to do more to meet [Hawkins' testimony]; it is suggestive that the defendant did not seek a

---

[4] O'Meara testified that he thought Hawkins called Sultis "brother," although he did acknowledge that he "might have" known of the "cousin" reference.

[5] In light of this finding it is unnecessary to consider the defendant's contention that a deliberate suppression requires a dismissal of the indictment.

continuance at the time. All this points up the want of 'materiality' in the sense of *Brady*; that is, the improbability that full cooperation of the prosecution with defense counsel would have resulted in a better defense case that would have impressed the jury [footnote omitted]." See also *Commonwealth* v. *Dabrieo*, 370 Mass. 728, 743-744 (1976).

The defendant next points to the prosecutor's failure to advise him on June 12, 1978, that Hawkins had just informed him (the prosecutor) and O'Meara that he had lied at the probable cause hearing. He argues that this "omission must be evaluated in the context of the entire record." *Commonwealth* v. *Ellison*, 376 Mass. 1, 23 (1978). He contends that because the verdict establishes that the Commonwealth's case was not strong and that because the jury might have regarded Hawkins' admission to his prior lie as little more than a way to escape from the relentless demands of defense counsel, the impact of the admission may have been lost. He seeks to satisfy *Agurs*, 427 U.S. at 112-113, and *Ellison*, 376 Mass. at 23,[6] by arguing that it is impossible for anyone to state with certainty that it would not have been more effective if the jury had been told that Hawkins' testimonial evasiveness could be refuted by his recent admission to the prosecutor and O'Meara. In other words, the defendant argues that this evidence would have closed the door on any possible jury speculation whether Hawkins' concession of his lie was merely his method of terminating incessant questioning on the issue. Having in mind that Hawkins' credibility had been impeached by pending firearms charges as well as by one for armed robbery and that the Commonwealth produced witnesses who saw the actual shooting, we do not see this omitted evidence as potentially creating a reasonable doubt as to the defendant's guilt that did not otherwise exist. See *Commonwealth* v.

---

[6] "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."

*Mains,* 374 Mass. 733, 736-737 (1978). Compare *Ellison,* 376 Mass. at 25-26.

The defendant's second and final assignment of error concerns the prosecutor's closing argument wherein he made reference, over the defendant's objection, to the defendant's failure to call a particular witness, Detective Ryan. He was one of the three officers who happened upon the scene at the precise moment of the shooting. He was seated in the front seat of the police cruiser. In his opening remarks to the jury, the prosecutor referred to him as an anticipated witness; however, Detective Ryan was never called to testify at the trial. Defense counsel argued to the jury in his summation that Ryan had the best opportunity of all the occupants of the police cruiser to observe the shooting. He told them that "you have a right to expect the Commonwealth to produce all the evidence in the case, and particularly that which is from the best vantage point." The prosecutor met these remarks head-on in his summation: "If Detective Ryan was so important to [the defendant's] case, isn't it true that he could have put him on himself? . . . If [the defendant] hadn't made the movements that he did with that witness, did he show the witness was unavailable in his own case?"

The defendant argues that he was entitled with impunity to invite the jury to draw an inference adverse to the Commonwealth because the witness was a police officer. He contends that, as such, the witness was not equally available to him and that the witness was favorably disposed to the Commonwealth. "Whether an inference can be drawn from the failure to call witnesses necessarily depends, as with inferences generally, upon the posture of the particular case and the state of the evidence." *Commonwealth v. O'Rourke,* 311 Mass. 213, 222 (1942). There is nothing in the record which indicates that the defendant attempted to summon the witness, see G. L. c. 277, § 66; *Commonwealth v. Blaikie,* 375 Mass. 601, 608-609 (1978), that he was unavailable to a defense summons, see *Commonwealth v. Dirring,* 354 Mass. 523, 529-530 (1968), or that the wit-

ness ignored such process. Compare *Taylor* v. *Commonwealth*, 369 Mass. 183, 186-189 (1975). Ryan's testimony might well have been merely cumulative to the Commonwealth's case. *O'Rourke*, 311 Mass. at 222-223.

We will not establish an ironclad rule that police officers are "clearly favorably disposed" witnesses to the Commonwealth and unavailable to defendants. See *Commonwealth* v. *Morrissey*, 351 Mass. 505, 514-515 (1967); *United States* v. *Johnson*, 467 F.2d 804, 809 (1st Cir. 1972). The record shows neither that the witness was unavailable to the defense nor that he was favorably disposed to the Commonwealth. The judge properly overruled the defendant's objection to the prosecutor's remarks, and he correctly instructed the jury that an adverse inference against either side could not be drawn from a failure to call a witness who was equally available to both. *Commonwealth* v. *Franklin*, 366 Mass. 284, 292-295 (1974). *Commonwealth* v. *Crespo*, 3 Mass. App. Ct. 497, 501 (1975).

*Judgment affirmed.*