## COMMONWEALTH *vs.* STEVEN A. SCHATVET.

Bristol.    September 15, 1986. — November 12, 1986.

Present: PERRETTA, KAPLAN, & FINE, JJ.

*Evidence,* Failure to produce witness, Intoxication, Right to obtain evidence, Consciousness of guilt. *Motor Vehicle,* Operating under the influence.

Where, at the trial of a complaint charging operation of a motor vehicle while under the influence of intoxicating liquor, the defendant offered cogent witnesses concerning his condition at the time in question and it appeared that further testimony on the subject by persons not called as witnesses would, in all likelihood, have been either nugatory or cumulative, the judge erred in permitting the prosecutor to cross-examine defense witnesses as to the availability of certain persons not summoned to testify, and in instructing the jury that they might permissibly infer that the testimony of such persons would have been unfavorable to the defendant. [133-136]

At a criminal trial the admission of evidence that the defendant made a certain remark ("I won't forget you") to an officer at a police station was not material error where the remark, even if made as a threat, did not evince a sense of guilt about the offense charged. [137]

The record of a criminal proceeding did not support the defendant's claim that he was entitled to dismissal of a charge of operating a motor vehicle while under the influence of intoxicating liquor, either on the ground that the police deliberately deprived him of an effective breathalyzer test or that they failed to inform him of his right to have a blood alcohol content test made by an independent physician. [137-138]

COMPLAINT received and sworn to in the Attleboro Division of the District Court Department on May 7, 1984.

In the jury session of the Fall River Division, the case was tried before *Robert L. Anderson,* J.

*Cornelius H. Kane, Jr.,* for the defendant.

*Phillip L. Weiner,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.  This was a trial by a jury of six in District Court on charges of operating a motor vehicle while under the influence of intoxicating liquor (G. L. c. 90, § 24) and of failing

to stay within a single lane (G. L. c. 89, § 4A). The jury found the defendant guilty, upon conflicting evidence, of the former charge, and, upon a virtual admission, of the latter.[1] As will appear, the verdict on the contested charge cannot stand as it was infected by prejudice arising from a mishandling by prosecutor and judge of the rule about "missing witnesses." We recount the evidence briefly.[2]

For the Commonwealth, Norton police Officer William Cheetham testified that about 1:45 A.M., May 5, 1984, driving in a marked cruiser north on route 140, he saw ahead a Chevrolet Corvair crossing some two and one-half feet over the dividing line into the southbound lane. This was at a place where the road takes a very wide sweeping curve. There was no traffic on the southbound lane at the time. The car passed back into the northbound lane, but wavered somewhat within the lane. Shortly thereafter the car crossed over the line a like distance at a similar wide-sweeping curve. Officer Cheetham turned on his blue lights. In response the car pulled over into the breakdown lane. As Cheetham approached from the stopped cruiser, the defendant, the driver of the car, while handing Cheetham the car registration and his driver's license through the rolled-down car window, inquired whether the stop was for speeding (actually the car speed of forty-five miles per hour was five miles over the speed limit). Cheetham said it was for not staying within the lane. Detecting, he testified, an odor of alcohol coming from the front part of the car, Cheetham ordered the defendant out and put him through three conventional field sobriety tests (mentioned in the margin[3]). It was as the defendant was doing the last test that Cheetham, relying on the defendant's poor performance (and also, it seems, on the defendant's appearance), decided to arrest him.[4]

---

[1] The latter case was placed on file and does not figure in the present appeal.

[2] We should mention here that the transcript is riddled with "inaudibles" and the contents of bench conferences are systematically omitted. Enough appears, however, to enable us to dispose of the appeal.

[3] Eyes closed, head tilted back, extending arms, then touching index finger to nose. Bending with feet together to pick up object from ground. Walking straight line, heel to toe.

[4] Officer Frederick P. Ferguson, Cheetham's partner in the cruiser, also testified, but added little to Cheetham's account.

Handcuffed, the defendant was taken in the cruiser to the Norton police station. The defendant's wife, Mary Schatvet, moved from the passenger seat, took the wheel, and followed the cruiser.

On the part of the defendant, testimony was given by Mrs. Schatvet, Steven P. Giampa, Walter E. O'Brien, and the defendant himself, which is summarized as follows. Giampa, a friend, picked up the defendant at the defendant's house in Norwood and the two drove in Giampa's car to a "bachelor's party" in Mansfield, arriving there between 9:15 and 9:30 P.M., May 14. They sat down to a substantial dinner. The defendant had two drinks of vodka with grapefruit juice. Leaving the party something more than two hours later, the two drove to a club, "The Gathering," in Norton, where they were to meet Mrs. Schatvet. Mrs. Schatvet was chatting with a woman, known to the defendant, as the two men entered the club about 12:15 A.M. The defendant had another vodka drink and Mrs. Schatvet a beer; they danced to the rock music of the five-man band, called "Round House," whose members were known to the Schatvets. Near closing, the defendant talked for a time with "Buck," who dealt with lighting, and at somewhat greater length with Walter O'Brien, the drummer. Mrs. Schatvet added that the other players came round briefly. About 1:00 A.M., the defendant, Mrs. Schatvet, and Giampa left the club. Giampa departed in his car, the defendant and Mrs. Schatvet in the Chevrolet heading home to Norwood. O'Brien, Giampa, and Mrs. Schatvet testified that the defendant looked normal and acted so through the evening. Mrs. Schatvet said his driving was normal.[5] The defendant testified that he was unaffected in his driving by his three drinks taken over the period of time. He admitted crossing the dividing line twice as a convenience in making the turns. He had not wavered within the northbound lane. He thought his performance of the tests was adequate (considering the hour and the fact that he was handicapped by blindness in one eye).

---

[5] Mrs. Schatvet said that (seated in the passenger seat) she did not observe the sobriety tests. (Evidently these took place to the rear of the driver's side of the car.)

1. The "missing witness" problem arose during the prosecutor's cross-examination of the defense witnesses. She inquired about the identity of the members of the band and the towns where they resided; also the identity and location of the woman who stood with Mrs. Schatvet as the defendant and Giampa entered the club. The prosecutor asked pointedly, were these persons present in the courtroom.[6] Her object was to show that, perhaps with some effort, the defendant could have gotten in touch with them and put them on the stand as witnesses. The prosecutor was implicitly inviting the jury to infer (and the same invitation became explicit in the judge's charge) that the defendant refrained from calling the potential witnesses because he knew or apprehended that he would be damaged by their testimony.

The defendant objected step by step to the prosecutor's making these inquiries. He asked for and secured a continuing objection to the prosecutor's line of inquiry. He filed a motion asking the judge, in effect, to forbid such inquiry unless the Commonwealth could assert a good faith basis for any supposition that these persons would, if called, give testimony unfavorable to the defendant. The motion was denied. The defendant moved for a mistrial; denied. Finally, the defendant requested the judge to refrain from giving any "missing witness" instruction: focusing an instruction on the point would still further encourage the jury to make the inference which the defendant regarded as wholly unwarranted on the record. Nevertheless the judge gave an instruction on the subject.[7]

---

[6] Thus we find the prosecutor asking Mrs. Schatvet: "*Q*. Walter O'Brien is here today? *A*. Yes, he is. *Q*. Is Bobby Biscay here today? *A*. No. . . . *Q*. Is the lead singer here today? *A*. No. *Q*. Now, the person who used to be with the band, do you know how to get in touch with him? *A*. Through Walter O'Brien. *Q*. He's not here today? *A*. Fred, no. *Q*. And who else? *A*. Bernie. *Q*. Is he still with the band? *A*. Yes. *Q*. Is he here? *A*. No."

It may be noted that the prosecution could likely have secured information about band members and others if it had chosen to follow up on O'Brien and Giampa who, together with Mrs. Schatvet, appeared on the list of prospective witnesses for the defense furnished to the Commonwealth. See, however, n. 8 below.

[7] The defendant asked that no instruction be given; he did not object to the substance of the instruction that was given. We note that the instruction was somewhat garbled and lacked clarity.

There was error. Briefly stated, the rule of law relevant here · runs thus. Where a party has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that person as a witness. If, then, without explanation, he does not do so, the jury may, if they think reasonable in the circumstances, infer that that person, had he been called, would have given testimony unfavorable to the party. See *Commonwealth* v. *Finnerty,* 148 Mass. 162, 166-167 (1889); *Commonwealth* v. *Franklin,* 366 Mass. 284, 292-294 (1974); McCormick, Evidence § 272 (3d ed. 1984).[8] There is no basis for any such inference when it appears that the testimony would be unimportant — merely corroborative of, or merely cumulative upon, the testimony of one or more witnesses who have been called. See McCormick, § 272 at 805 & n.12; *Dent* v. *United States,* 404 A.2d 165, 169-173 (D.C. 1979); *State* v. *Brown,* 169 Conn. 692, 705 (1975). Cf. *Commonwealth* v. *Buonopane,* 9 Mass. App. Ct. 651, 659 (1980).[9] Because the inference, when it is made, can have a seriously adverse effect on the noncalling party — suggesting, as it does, that the party has wilfully attempted to withhold or conceal significant evidence — it should be invited only in clear cases, and with caution. See *Commonwealth* v. *Finnerty,* 148 Mass. at 167; *Grady* v. *Collins Transp. Co.,* 341 Mass. 502, 506 (1960); *Commonwealth* v. *Franklin,* 366 Mass. at 294. Indeed, except in such clear cases a judge may well warn

---

[8] It is not accurate to say that where the person is "equally available" to both parties no inference may be drawn from the failure of either to call him. "What is in fact meant is that when so far as appears the witness would be as likely to be favorable to one party as the other, there will be no inference." McCormick, § 272, at 806. See *Commonwealth* v. *O'Rourke,* 311 Mass. 213, 222 (1942); *Commonwealth* v. *Franklin,* 366 Mass. at 293; *Commonwealth* v. *Bryer,* 398 Mass. 9, 12 (1986).

[9] Similarly, the testimony is unimportant, and an inference unwarranted, where the case made against the party lacks strength and there is no occasion for the party to respond by calling the absent person. Thus it is said, "First of all, the judge should consider the strength of the case against the defendant." *Commonwealth* v. *Franklin,* 366 Mass. at 293.

against making any inference from the fact that a person is not produced as a witness. See *Commonwealth* v. *Finnerty,* 148 Mass. at 167; *Commonwealth* v. *Cobb,* 397 Mass. 105, 108-109 (1986). Circumspection in this matter is especially called for where the inference would run against a defendant in a criminal prosecution, for the inference may come uncomfortably close to invading constitutional rights.[10]

It was a question of law for the court in the present case whether, upon the record made, the prosecutor was entitled, over objection, to inquire as she did; and correspondingly, it was a question of law whether there was a proper foundation in the record for a "missing witness" instruction. "The sufficiency of the foundation for such inferences must first be determined by the court." *State* v. *Langlet,* 283 N.W.2d 330, 335 (Iowa 1979). The point is elaborated in *Burgess* v. *United States,* 440 F.2d 226, 237 (D.C. Cir. 1970) (concurring opinion), quoted in the margin.[11] Here the questions of law should have been answered in the negative. The defendant had offered witnesses about his condition during that night (cogent witnesses, because they were with the defendant for the more extended periods of time). Further testimony on the subject by the absent persons would in all likelihood have been either nugatory or

---

[10] See *Commonwealth* v. *Finnerty,* 148 Mass. at 167; *Commonwealth* v. *Niziolek,* 380 Mass. 513, 521-522 (1980), habeas corpus denied, *Niziolek* v. *Ashe,* 694 F.2d 282, 291-292 (1st Cir. 1982); *Commonwealth* v. *Bryer,* 398 Mass. 9, 12 (1986); *Commonwealth* v. *Happnie,* 3 Mass. App. Ct. 193, 195 (1975). Mentioned in this connection have been the privilege against self-incrimination, the defendant's right without inference against him to decline to testify, and the Commonwealth's fixed burden to prove guilt beyond a reasonable doubt.

[11] "As in instances of other sought-after inferences, it is the court's function to determine whether a jury could appropriately deduce from the underlying circumstances the adverse fact sought to be inferred, leaving it for the jury to say whether the inference actually ought to be drawn in the particular case. [Footnote omitted.] The noncalling party's explanation suffices, and the missing witness rule is properly rejected, where the trial judge is 'satisfied that the circumstances thus offered would, in ordinary logic and experience, furnish a plausible reason for nonproduction.' [Quoting from 2 Wigmore, Evidence § 290 (Chadbourn rev. 1979).]" The plausible reason in our case for nonproduction is that the evidence would at most be cumulative.

cumulative;[12] the prosecutor did not leap to the challenge of even professing a belief otherwise. A party need not call everyone who might have information on a given subject, on pain, if he omits any, of suffering a jury inference that he is wrongly withholding damaging evidence. See *State* v. *Sarinske,* 91 Wis. 2d 14, 54-55 (1979). (There were thirty guests dining at Mansfield and probably as many or more dancing at the club; how far might the defendant be obliged to exhaust the lists?) We add that we are unable to say the errors described were "harmless." See *Kotteakos* v. *United States,* 328 U.S. 750, 764 (1946). On the contrary, they were "highly prejudicial," just as error in allowing a missing-witness inference was held to be in *Commonwealth* v. *Domanski,* 332 Mass. 66, 71 (1954); and see *Heina* v. *Broadway Fruit Mkt., Inc.,* 304 Mass. 608, 611 (1939); *Commonwealth* v. *Cobb,* 397 Mass. at 109.[13] It does not matter that the prosecutor's actions arose (as we assume) from a misunderstanding of the law rather than from a purpose to mislead.

2. Other matters: (a) The defendant contends that the judge erred in admitting in evidence, on the score of "consciousness

---

[12] For examples of contrasting cases, where the testimony would probably have had distinct importance, and an inference could thus be fairly made, see *Commonwealth* v. *O'Rourke,* 311 Mass. 213, 222-223 (1942); *Grady* v. *Collins Transp. Co.,* 341 Mass. at 509; *Commonwealth* v. *Bryer,* 398 Mass. 9, 11 (1986); *Commonwealth* v. *Happnie,* 3 Mass. App. Ct. 193, 194-195, 197-198 (1975). In *Bryer,* a prosecution for operating under the influence and so as to endanger, the Commonwealth presented a strong case through the detailed testimony of three officers. The defendant testified that he was at his apartment from 9:00 P.M. to midnight, then at a bar, and around 12:30 A.M. drove toward his office and was stopped. He said he had had two drinks at home and half a drink at the bar. His roommate, he said, was at the apartment with him for about a half hour, and at the bar for ten minutes. Here was a single, pinpointed person, seemingly friendly to the defendant, with singular, and thus important information about the defendant's drinking and condition. In these circumstances the prosecutor was entitled to bring out in questioning the defendant that he never asked the roommate to testify; and so the court held.

[13] In these cases it had not been shown that the missing witnesses were "available" to the noncalling party. In *Cobb,* no objection was taken; but the court held that the error created a "substantial risk of a miscarriage of justice" and reversed the judgments.

of guilt" (and thereafter instructing on the subject), remarks made by the defendant to Officer Peter Dugas at the police station ("I won't forget you"). A jury might possibly find that the remarks were intended as a threat of physical injury to the officer but, as the officer had no connection with the arrest, it is not easy to see how the threat, if it was one, evinced a sense of guilt about the offense charged.[14] On the whole, however, we would not be inclined to hold that there was material error.

(b) By motion in limine the defendant had sought dismissal of the charge of driving under the influence. His motion went on the ground that the police deliberately deprived him of an effective breathalyzer test after he had consented to such a test, and again, that the police failed to inform him of his right to have a blood alcohol content test made by an independent physician. After hearing evidence offered by the defendant and the Commonwealth, the judge denied the motion without making findings.

On the first point, the defendant evidently attempted to bring himself within the suggestion (not a holding) of *Commonwealth* v. *Alano,* 388 Mass. 871, 877 (1983), that a defendant might be entitled to relief (not specifically defined) if the police in "bad faith" deprived him of the benefits of G. L. c. 90, § 24 (1)(*e*), concerning police provision of the breathalyzer test. The defendant made a first pass at blowing into the mouthpiece of the machine; it registered "Invalid Sample." He was given a second chance with the same result. Officer Dugas, who administered the test, believed that the defendant was not directing his breath fully into the mouthpiece, but deliberately allowing much of it to escape. Accordingly, the defendant was marked as having "refused" the test. If the defendant in fact asked for a third chance, as he claimed, the police were justified in declining to grant it. Findings on the lines just indicated

---

[14] The defendant said he was making no threat but expressing chagrin that Dugas, a fellow "martial arts" gymnast, had been discourteous in answering his questions about Miranda rights, and had thus shown "disrespect" under the karate code of behavior.

would be well supported by the record.[15] There was some effort on the defendant's part to suggest that Dugas somehow maliciously subverted the test, but the attempt was feeble.[16]

*Commonwealth* v. *Andrade,* 389 Mass. 874, 882 (1983), suggests that a failure by the police to accord the defendant a "reasonable opportunity" for a test by an independent physician (G. L. c. 263, § 5A) may in some circumstances call for dismissal of a charge of driving under the influence. There was satisfactory evidence that the defendant was duly informed of the right and none that the police hindered him in pursuing it. Ordinarily, at least, the police are not bound to do more than inform the person of his right; that was the extent of their duty here. See also *Commonwealth* v. *Lindner,* 395 Mass. 144, 146-147 (1985).

To sum up, as a result of errors in allowing missing-witness interrogations and in instructing on the subject, the judgment will be reversed and the verdict set aside; the case to stand for a new trial.[17]

*So ordered.*

---

[15] The defendant suggested that the machine had malfunctioned, but this alone would not avail him, as the *Alano* case indicates, 388 Mass. at 877.

[16] The encounter with Dugas at the breathalyzer did not form any part of the trial record and thus did not bear on point 2(a) above.

[17] We need not dwell upon the defendant's request for an instruction about an alleged irregularity in his detention at the police station.