COMMONWEALTH *vs.* RICHARD J. GEARY.

No. 90-P-1491.

Suffolk. October 17, 1991. - May 12, 1992.

Present: PERRETTA, FINE, & IRELAND, JJ.

*Practice, Criminal,* Opening statement, Motion in limine. *Evidence,* Failure to produce witness.

The judge at a criminal trial did not err in denying defense counsel's motion in limine, asking that the prosecutor be permitted to refer in his opening statement only to those prospective witnesses on whom summonses had been served in hand, where nothing before the judge would have permitted a conclusion that a certain witness would be unavailable, or that the prosecutor did not have a good faith and reasonable expectation that she would appear to testify. [513-514]

The judge at a criminal trial properly restricted the prosecutor's inquiries concerning a potential witness who did not appear to testify, and he correctly instructed the jury concerning the prosecutor's reference to that witness's anticipated testimony; consequently, this court concluded that the defendant's conviction was not the result of any prejudicial suggestion by the prosecutor. [514-516]

INDICTMENT found and returned in the Superior Court Department on July 14, 1989.

The case was tried before *John J. Irwin, Jr., J.*

*Dana A. Curhan* for the defendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney (*Brian J. Carney,* Assistant District Attorney, with him) for the Commonwealth.

PERRETTA, J. Contrary to the prosecutor's prediction in his opening statement to the jury, Susan O'Leary never appeared at the defendant's trial to relate how the defendant told her, in effect, "[N]o matter what happens tonight, you don't know anything." When she could not be found, the prosecutor asked various witnesses if they knew where she was. On his appeal from his conviction for murder in the sec-

ond degree, the defendant argues that by the opening state-
ment and the questions, the prosecutor impermissibly con-
veyed to the jury a suggestion that the defendant was
responsible for the absence of a witness who would have tes-
tified against him. Because of the prosecutor's good faith be-
lief that the witness would be present, we conclude that there
was no error in the denial of the defendant's motion that the
prosecutor be permitted to refer in his opening statement
only to those prospective witnesses who had been served in
hand. Because the trial judge ruled appropriately on ques-
tions about the absent witness and properly instructed the
jury on this issue, we conclude that the defendant received a
fair trial and affirm the conviction.

It appears from the testimony that O'Leary's Pub, an es-
tablishment located near where the victim was shot, served a
largely local, or neighborhood, clientele. Most of the wit-
nesses, including the defendant, had been at the pub on the
night and early morning of July 4-5, 1989. Additionally,
most of them knew or had been friendly with the defendant.
Mark O'Leary owned and managed the pub, and his wife,
the absent witness Susan, worked there two or three nights a
week. They lived in an apartment above the pub with their
infant son and Susan's daughter, a toddler, from a prior mar-
riage, and a young man to whom they rented a room. He
sometimes would work in the bar and tend the children. The
defendant was a police officer for the Boston Housing Au-
thority and worked in the pub on weekends as a "bouncer."
The victim was known to many of the witnesses and had
been an occasional customer at the pub.

There are inconsistencies in the testimony, perhaps be-
cause of the amount of alcohol consumed, the time span in-
volved, people coming and going, the relationships between
some of the witnesses, and their different vantage points. It is
fair to characterize some of the witnesses called by the Com-
monwealth as reluctantly responsive, although not hostile.
The Commonwealth presented evidence to show that the de-
fendant and the victim had been in the bar that night and
early morning. At some point after the victim left, the doors

to the pub were closed to new customers. The defendant left the bar and walked up the street. He was behind the victim, who turned to face him. The defendant pulled a gun from his waistband, shot the victim in the face, and fled.

The defendant testified that while in the bar that night, the victim had been argumentative towards him. The defendant ignored his remarks and stayed away from him. When the victim left the bar, the defendant deliberately lagged behind because he was somewhat afraid of the victim and did not want to encounter him outside. After some time had passed, the defendant left the bar and started up the street. The victim had not left the area, and he called to the defendant. The defendant feared that the victim had a gun. He tried to get back into the bar but could not. As the victim came closer, he made a gesture. Thinking that the victim was reaching for a gun, the defendant shot him. He did not intend to kill him.

The shooting occurred close enough to the pub that the people still inside heard a loud bang. Susan O'Leary opened the door, looked out, and went to the phone and called the police. The defendant was quickly apprehended. He was found in the O'Learys' apartment. The defendant could remember nothing that happened after shooting the victim. The police testified that when the defendant was told that the victim had died, the defendant stated that he had not meant to kill him but that he probably had done everyone a "favor."

1. *The prosecutor's opening statement.* Trial commenced, as scheduled, on December 6, 1989. Mark and Susan O'Leary had been interviewed by the Commonwealth in the course of its investigation and were expected to testify. Summonses had been left in their mailbox on December 2 or 3. After the jury had been taken on a view, the defendant presented a motion in limine, asking that the prosecutor be permitted to refer in his opening statement only to those witnesses who had been served in hand. The ground for the motion was that his investigator had been unable to locate four of the Commonwealth's witnesses, including Susan O'Leary,

and, based upon that inability, defense counsel did not believe that the witnesses were available to testify. The trial judge declined to impose that limitation upon the prosecutor.

It is the defendant's argument that, because it was "clear" that Susan O'Leary was "unavailable," the trial judge was in error in not allowing the motion in limine. We do not agree. "The prosecutor properly could have referred in his opening to anything that he expected to be able to prove by evidence. This expectation must, of course, have been reasonable and grounded in good faith. See *Gladden* v. *Frazier*, 388 F.2d 777 (9th Cir. 1968)." *Commonwealth* v. *Fazio*, 375 Mass. 451, 456 (1978). See also Smith, Criminal Practice & Procedure § 1839 (2d ed. 1983 & Supp. 1990). The witnesses had been served in accordance with Mass.R.Crim.P. 17(d)(1), 378 Mass. 886 (1979). The first suggestion the prosecutor had that Susan O'Leary might not appear was that given by defense counsel in arguing the motion in limine. The sole basis for that motion was the fact that the defendant's investigator had been unable to locate four of the Commonwealth's expected witnesses, one of whom nonetheless did appear and testify. Susan lived with her husband Mark, their infant son, and her young daughter. There was no suggestion by defense counsel that Mark, who had been summonsed in the same manner as Susan, could not be located by the investigator. There is nothing in the record before us which would lead us to conclude that the prosecutor did not have a good faith and reasonable expectation that Susan O'Leary would appear and testify in the manner described in the opening statement. We see no error in the trial judge's denial of the defendant's motion in limine.

2. *Inquiries about the absent witness.* Presentation of the evidence did not begin until December 8, 1989, the first two days of trial having been devoted to empanelment of the jury, the view, and the Commonwealth's opening statement. Susan O'Leary did not appear on December 8, or thereafter. In testifying, many of the witnesses made reference to her. She was in the pub throughout the material time in issue, and she was the person who called the police. The prosecutor

asked several of those witnesses who reasonably could be thought to have knowledge of Susan O'Leary's whereabouts (for example, her husband and her father) if they knew where she was. They testified that they did not. The defendant argues that those questions improperly suggested that the defendant was responsible for her absence.

In the Commonwealth's judgment, it was faced with a dilemma: "Where a party has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that person as a witness. If, then, without explanation, he does not do so, the jury may, if they think reasonable in the circumstances, infer that that person, had he been called, would have given testimony unfavorable to the party. . . . Because the inference, when it is made, can have a seriously adverse effect on the noncalling party — suggesting, as it does, that the party has wilfully attempted to withhold or conceal significant evidence — it should be invited only in clear cases, and with caution." *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). The jury had been informed at the outset that the Commonwealth would present Susan O'Leary, who would testify to a statement by the defendant relevant to the issue of his premeditation. After this preview, the Commonwealth's failure to call her could be thought suspect, especially in light of the presence at trial of her husband, father, and acquaintances and, hence, her apparent availability.

In asking the witnesses if they knew of Susan O'Leary's whereabouts, the prosecutor was in a "delicate area, requiring caution." *Commonwealth* v. *Zagranski*, 408 Mass. 278, 287 (1990). However, even if he was unmindful of the possibility that the jury might infer from his questions that the defendant was somehow responsible for her absence, the trial judge was aware of this potential problem. He kept a tight control on the prosecutor. Those instances of excess by the prosecutor, and there were some, all occurred either at side bar, voir dire, or lobby conferences. When defense counsel

indicated that he would not be asking the jury to draw any inference from the prosecutor's failure to present Susan O'Leary's testimony as he had described it, the trial judge precluded all further questions about her. Moreover, he instructed the jury during the trial that the witnesses' knowledge or lack of knowledge of her whereabouts was only relevant to determine whether she was available to come to court and testify. His final instructions included the admonition that opening statements are not evidence and that "if there was a representation by any counsel that a witness was going to testify to a certain item or a certain thing and that witness was not able to be presented here or did not appear here and did not testify, obviously, you can't consider any reference to that particular subject matter as being any kind of evidence in the case one way or the other."

Based upon all the evidence, the trial judge's limitations on the questions, and his instructions to the jury, we conclude that the defendant's conviction was not the product of an improper and prejudicial suggestion. Compare *Commonwealth v. Bearse,* 358 Mass. 481, 486-487 (1970).

3. *The instructions on intoxication.* For the reasons most recently stated in *Commonwealth v. Moore,* 408 Mass. 117, 134, 135 (1990), we see no error in the trial judge's instructions on malice and voluntary intoxication.

*Judgment affirmed.*