## Commonwealth *vs.* Scott McQuade.

No. 96-P-1478.

Suffolk. November 17, 1998. - May 25, 1999.

Present: Laurence, Kaplan, & Dreben, JJ.

*Evidence,* Hearsay, Common criminal enterprise, Failure to produce witness, Relating to deliberation by jurors, Consciousness of guilt. *Practice, Criminal,* Instructions to jury, Deliberation of jury, Loss of evidence by prosecution, Assistance of counsel. *Jury and Jurors.*

At the trial of indictments for arson and malicious destruction of property, the defendant's coventurers' false alibi statements to police were admissible as statements of joint venturers acting in furtherance of the venture by a cooperative post-crime effort to conceal the criminal enterprise. [829-830]

At the trial of indictments, the judge did not err in giving a missing witness instruction with respect to the defendant's brother, who was identified in the defendant's pretrial notice of alibi and who was present in the courtroom during the trial, where the brother could have been expected to offer testimony of distinct importance to the defendant's case that was not merely cumulative of testimony of the defendant's two other alibi witnesses. [830-833]

A criminal defendant did not demonstrate that the jury that convicted him were in fact exposed to specific facts reflecting a significant extraneous influence to warrant an inquiry of the jurors in accordance with *Commonwealth v. Fidler,* 377 Mass. 192 (1979). [833-835]

At the trial of an arson case, the judge correctly denied the defendant's motion to dismiss the indictments on the ground that the Commonwealth had improperly discarded fire scene samples, where the samples were not material and their absence not prejudicial in light of the abundant other evidence that the fire had been set. [835]

At the trial of a criminal case, evidence of the defendant's threat to kill a prospective witness was properly admitted as tending to show the defendant's consciousness of guilt. [835]

On appeal from convictions, the defendant's trial counsel was not demonstrated to have provided ineffective assistance at trial by reason of eliciting the defendant's criminal record on his direct examination or failing to introduce evidence not material to the defense. [835-836]

Indictments found and returned in the Superior Court Department on December 29, 1993.

The cases were tried before *Thomas E. Connolly,* J., and a motion for a new trial, filed on September 18, 1996, was heard by him.

*Robert J. Wheeler, Jr.,* for the defendant.

*Ellyn H. Lazar-Moore,* Special Assistant Attorney General, for the Commonwealth.

LAURENCE, J. The defendant, Scott McQuade, was convicted in November, 1995, by a Suffolk County jury of eleven counts of arson and malicious destruction of property. In his direct appeal, his principal arguments are that the trial judge erred in (1) allowing the Commonwealth to introduce statements made by two of his alleged coventurers to police during interviews in which they gave what the prosecution characterized as false alibis; (2) giving a missing witness instruction regarding his failure to call his brother, James McQuade, whom the defense had identified as an alibi witness in pretrial proceedings; and (3) denying his motion for a new trial and an evidentiary hearing and interview of jurors on the ground that the jury had been exposed to "disturbing extraneous influences."

The defendant also contends that the judge erred in denying his motion to dismiss the indictments based upon the Commonwealth's chemist's negligent discarding of samples taken from the fire scene, which the defendant claims may have been potentially exculpatory; and allowing the Commonwealth to introduce evidence of an alleged threat made by him against a former girl friend who spoke to the police about the incident and later testified as a prosecution witness. Finally, on his consolidated appeal from the denial of his motion for a new trial, the defendant argues that his trial counsel provided him with ineffective assistance, creating a substantial risk of a miscarriage of justice, by introducing "devastating" evidence of his prior "bad acts," convictions, incarceration, and general bad character and by failing to lay an evidentiary foundation to permit his expert witnesses to challenge the conclusions of the prosecution's chemist.

We agree with the Commonwealth that none of the defendant's appellate assertions has merit. We address at length only the three that appear most colorable, with a passing reference to the others at the end of this opinion.

1. *Coventurers' statements.* The Commonwealth's case depicted the defendant committing the arson (which occurred on Highland Street, Revere, sometime between 1:00 and 2:00

A.M. on the morning of December 14, 1990, and created a conflagration that consumed a dozen buildings) while engaged in a joint venture with Shane Scott, William Tilton, and Christopher Campbell (all of whom had already pleaded guilty). The Commonwealth's theory of motive was that the (all white) defendants, led by Campbell, were racially biased against the Hispanic, Asian, and other minority residents of the buildings at the fire scene. The defense case focused on the defendant's alibi: he had been at his home on Beach Street with his grandmother, his brother, and a friend, Kevin Lyons, the entire evening and early morning hours of December 13-14, 1990, until at least 5:30 A.M., at the very time of the fire (which took place approximately four blocks from his home). The Commonwealth produced several witnesses who placed all of the alleged coventurers at or near the scene either shortly before or just after the fire erupted. The lead police witness, Officer Goodwin, was permitted to testify, over objection, that shortly after the fire (but over a year before the four identified coventurers were arrested) he had separately interviewed Shane Scott, William Tilton, and the defendant in an attempt to identify the perpetrators of the arson, and that each had claimed to have spent the entire night of the fire in his respective home.

The defendant argues that the false alibi statements of Scott and Tilton were inadmissible hearsay and unfairly undermined his alibi defense. We disagree. The Scott and Tilton interviews were admissible as out-of-court statements by criminal joint venturers acting in furtherance of the venture by means of a cooperative post-crime effort to conceal the criminal enterprise.[1] See *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976); *Commonwealth* v. *Mahoney*, 405 Mass. 326, 330-331 (1989); *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990); *Commonwealth* v. *Angiulo*, 415 Mass. 502, 518-519 (1993).

In this connection, the Commonwealth had previously established that the defendant and the three other coventurers were not merely discrete individuals unconnected except by involvement in the crime charged. They were, rather, all known

---

[1]The defendant does not contend that there was insufficient evidence of joint venture to permit the court to admit the challenged evidence. He also concedes the general hearsay exception for statements of joint venturers made during the pendency of the cooperative effort and in furtherance of its goal, including attempts to conceal their role in committing the illegal act. His contention is that all aspects of the joint venture had ceased as of the dates of the false alibi statements by Scott and Tilton.

members of a gang called the "Avenue Boys," who "hung out" together, in an area proximate to the defendant's home, as well as to the fire scene, both before and after the conflagration and who racially harassed minority residents of the neighborhood. Given that the coventurers' group relationship continued after the crime and that none had been apprehended or incarcerated before the challenged statements, the judge "was within his discretion in ruling that there was '[a]n adequate probability of the existence of . . . [a continuing] common venture' " to conceal the crime at the time the statements were made so soon after the commission of the crime. *Commonwealth* v. *Angiulo*, 415 Mass. at 520, quoting from *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 (1983). Cf. *Commonwealth* v. *White*, 370 Mass. at 709 n.8.

In concluding that no reversible error was occasioned by the admission of the Scott and Tilton statements, we are also mindful that the judge instructed the jury, repeatedly and at length, both during and after that evidence, as to the definition of a joint venture and the fact that the jury could not consider any statement of an alleged coventurer against the defendant unless they first found that the Commonwealth had proved beyond a reasonable doubt that a joint venture existed and that the statement was made during and in furtherance of the goal of the joint enterprise.

2. *Missing witness instruction.* The defendant's major appellate contention is that the judge erred in giving a "missing witness" instruction regarding the defendant's failure to call his brother, James McQuade, as a witness supporting his alibi. He does not dispute any of the foundational requirements for such an instruction, see *Commonwealth* v. *Thomas*, 429 Mass. 146, 149-151 (1999); *Commonwealth* v. *Richardson*, 429 Mass. 182, 183-184 (1999); *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134-136 (1986), except for the condition that the testimony of the absent witness must appear "of distinct importance to the case." *Commonwealth* v. *Figueroa*, 413 Mass. 193, 199 (1992), quoting from *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. at 134.

To buttress his alibi defense (that he was at home at the time of the fire), the defendant himself testified and offered the confirming testimony of his grandmother (in whose apartment he resided) and a long-time friend, Kevin Lyons, who had stayed over in the apartment on the night in question. He did not call

his brother, James (who was also supposed to have been in the apartment with the defendant the entire evening of the fire), despite having given pretrial notice of his intent to do so (and despite James's actual presence in the courtroom throughout the trial). He contends that no basis for the adverse inference instruction existed because he had a "plausible reason for non-production of the witness," *Commonwealth* v. *Anderson*, 411 Mass. 279, 282-283 (1991), namely that James's testimony would have merely been cumulative of his grandmother's and Lyons's and therefore unimportant. Compare *Commonwealth* v. *Richardson*, 429 Mass. at 184-185; *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. at 134-136.

We conclude that the judge did not abuse his discretion in providing a missing witness instruction to the jury for three reasons: The case against the defendant was relatively strong (at least four eyewitnesses having identified the defendant as being at the arson scene with his coventurers and acting in a suspect manner just before the fire); the Commonwealth introduced a great deal of evidence contradicting the defendant's alibi (including eyewitnesses who saw him out on the street at the very time he claimed to have been home); and, most significantly, James — had he really been with the defendant throughout the evening in question — could have been expected to offer testimony of distinct importance to the defendant's case which was not merely cumulative of the testimony of the grandmother and Lyons.

Although Lyons and the defendant's grandmother both testified that the defendant was with them and did not leave the apartment over the evening of December 13-14, 1990, their testimony was not comprehensively exculpatory. Confirming the defendant's testimony, they both claimed to have seen and heard the defendant speaking on the telephone that evening to his then-girlfriend, Lisa DiGiovanni, who called the defendant twice, the first time (so they said) from 10:00 P.M. to 10:30 or 11:00 P.M., and the second time from sometime after midnight for one to one and one-half hours (or to 1:00 - 1:30 A.M.).

The time frame they attested, however, was significantly at odds with the testimony of Lisa herself and her father, who stated that Lisa had spoken to the defendant on the telephone for no more than half an hour on the night of the fire, sometime between 9:00 and 9:30 P.M., and again from 11:15 to no later than 11:30 P.M., and that Lisa was in bed asleep with her

telephone unplugged by 11:30 P.M. Moreover, Lyons admitted to falling asleep at some point during the second call, waking up only at around 6:00 A.M. the next morning. Meanwhile, the grandmother was only fleetingly in the darkened room (described as a "playroom") where the defendant claimed to have watched television, spoken to Lisa, and finally slept, always in the presence of Lyons and his brother James. The grandmother had occupied herself virtually the entire evening in a kitchen (preparing food for a party) that was located at the opposite end of the large apartment from both the playroom and the front entrance. She could not see the playroom from either the kitchen or her bedroom.

In light of (a) the lacunae in the supposedly corroborative stories of the grandmother and Lyons; (b) the conflicting evidence of the DiGiovannis as to the time of the calls; (c) the testimony of three of the prosecution's witnesses that they had seen and recognized the defendant (first at the Revere subway station at 10:20 P.M., then at the building where the fire broke out, sometime after midnight and possibly as late as 1:00 A.M.) at the very times he claimed to be at home; and (d) the fact that the defendant's home was a mere four blocks from the fire scene — probably no more than a three to five minute walk — the testimony that James could provide could not be deemed duplicative of the fragmentary evidence of the grandmother or the sleep-truncated testimony of Lyons. That the defendant expressly announced his pretrial intention to call James additionally undercuts his present assertion that James's evidence was unimportant. That James might not have provided full corroboration is not determinative. See generally *Commonwealth* v. *Thomas*, 429 Mass. at 152-153.[2] Consequently, an inference that James McQuade was not called because his testimony might have been adverse to the defendant was permissible, and the judge's giving of an appropriate missing witness charge regarding the defendant's failure to call James was well within his

[2]As a close relative of the defendant, James might be argued to have been less credible, and therefore less desirable, a witness than Lyons, except for the fact that Lyons portrayed himself as a life-long intimate friend of the defendant, considering himself a brother and member of the family and on occasion living with them. That portrayal was confirmed in the testimony of the defendant and his grandmother.

discretion and not "manifestly unreasonable." *Commonwealth v. Gagliardi*, 29 Mass. App. Ct. 225, 244 (1990).[3]

3. *Extraneous jury influences*. Over three weeks after the defendant's convictions, the judge received a handwritten letter from a juror who said that he "had made a mistake . . . [and] was too hasty in casting [his] vote." The letter mentioned in particular that "the rumor that *Campbell* had fingered *McQuade* might have corroborative [*sic*]. It could have added a tint of guilt. It was not court evidence. The jurist [*sic*] who said it might have known something more than said. . . . If Campbell fingered McQuade, there is to me a hint of plea bargaining. . . . How this information was accepted by the jurists, I do not know. It was unofficial and most probably not accepted except for the hard core of four, who didn't need it anyway."

Based upon this letter,[4] the defendant sought a new trial, asserting that the letter "establish[ed] that disturbing extraneous matters were brought to the jury's attention during trial and deliberations" and demanded at the very least a hearing with interviews or examination of all the jurors, in compliance with *Commonwealth v. Fidler*, 377 Mass. 192 (1979). After conducting a nonevidentiary hearing with oral argument on the motion, the judge denied it in all respects.

The juror's letter did not require further inquiry into the jury's deliberations, much less constitute grounds for vacating the defendant's convictions and ordering a new trial. "There has been no showing that *specific facts* not mentioned at trial concerning one of the parties or the matter in litigation were brought to the attention of the deliberating jury," *Commonwealth*

---

[3]Although the prosecutor requested the missing witness instruction, he did not comment on the matter in his closing. The defendant's additional objection that the instruction itself was defective because of the judge's failure to say in it that the truth of the inferences had to be proved beyond a reasonable doubt (which he did not raise at trial) has no merit. In light of the correctness of the judge's overall charge, including his repeated references to the Commonwealth's burden of proving every fact beyond a reasonable doubt, "[t]he jury could not have been uncertain as to the standard they were to use," *Commonwealth v. Olszewski*, 416 Mass. 707, 724 n.18 (1993), cert. denied, 513 U.S. 835 (1994), and no substantial risk of a miscarriage of justice was created.

[4]The letter also stated that the jurors had suffered discomfort, headaches, and nausea while deliberating because of the notorious noxious fumes problem at the Suffolk County Court House, a situation which the defendant claimed deprived him of his constitutional right to a fair trial and was a separate ground for his new trial motion. He does not press this issue on appeal.

v. *Drumgold*, 423 Mass. 230, 261 (1996) (emphasis added). There is nothing in the letter stating, or even suggesting, that during deliberations the jury were subjected to (let alone discussed) any extraneous influences or matters of the objectively ascertainable sort *Fidler* addressed (e.g., unauthorized views, third person communications, consideration of documents not in evidence, 377 Mass. at 197-198) which might call into question the validity of the guilty verdicts. Contrary to the defendant's position that "the jury were made aware that alleged joint venturer Christopher Campbell had implicated and 'fingered' defendant Scott McQuade," the letter does not suggest that the jury "were made aware" of any such fact. It merely refers to a "rumor that Campbell had fingered McQuade" without citing any source for such a rumor, then further states that "[t]he jurist who said it might have known something more than said."

A commonsense reading of these statements is that the only source of the "rumor" was speculation by the "jurist," further speculated on by the letter writer. Nothing in the letter suggests the source was extraneous to the jury's deliberations. The very speculation by the writer, that the "jurist . . . might have known something more," further supports the conclusion that the source of any rumor was jury speculation, since the juror who purportedly started the rumor clearly did not claim to "know" that Campbell had in fact implicated McQuade — had the juror done so, there would have been no need for the writer to wonder how and how much the rumormongering juror knew about the matter. Additional support for the conclusion that the so-called rumor was nothing more than jury speculation is that no juror could have "known" that Campbell implicated McQuade, because Campbell did not do so — he neither provided a statement nor testified against McQuade.

With no basis in fact for the so-called rumor, and nothing in the letter satisfying the defendant's "burden of demonstrating that the jury were in fact exposed," *Commonwealth* v. *Fidler*, 377 Mass. at 201, to "specific facts" reflecting "a significant extraneous influence," *Commonwealth* v. *Drumgold*, 423 Mass. at 260-261, the judge could properly conclude that the rumor reference was not "an overt factor" of extraneous origin but rather a product of the jury's own subjective mental processes and therefore insufficient to warrant post-verdict questioning of

the jury. *Commonwealth* v. *Fidler*, 377 Mass. at 198.[5]

4. The defendant's lesser contentions fare no better.

a. *Lost evidence.* The Commonwealth correctly points out that the defendant failed (i) to establish any reasonable possibility that retesting of the discarded fire scene samples would have been possible, much less exculpatory, or (ii) to demonstrate that the trial judge abused his discretion in applying the learning of *Commonwealth* v. *Willie*, 400 Mass. 427, 432-433 (1987), to deny the defendant's motion to dismiss. The lost samples were not material and their absence not prejudicial, because of the abundance of other evidence on the issue whether the fire had been deliberately set, as well as the defendant's own expert's concession that he could essentially replicate the tests used on the lost samples (although he did not do so) from evidence about the machine used in the testing, which was in fact provided by the Commonwealth.

b. *Defendant's threats.* The Commonwealth's evidence that shortly after he was indicted the defendant had threatened to kill his (by now) former girlfriend, Lisa DiGiovanni (who had given a statement to the police just before the indictments, which undermined his alibi), was properly admitted. The circumstances reasonably permitted the inference that the defendant had made the threat either because he believed Lisa had incriminated him or to prevent her doing so. In either case it was admissible as tending to show the defendant's consciousness of guilt, see *Commonwealth* v. *Toney*, 385 Mass. 575, 584 n.4 (1982); *Commonwealth* v. *Miles*, 420 Mass. 67, 75 (1995); *Commonwealth* v. *Fernandes*, 427 Mass. 90, 93-94 (1998), and the judge's detailed (and unchallenged) instruction on consciousness of guilt insured that the jury would not have considered the threat unless the inference was a reasonable one in light of the evidentiary circumstances.

c. *Ineffective representation.* There is nothing to the defen-

[5]Of course, even if the letter expressly stated that the jury had speculated among themselves whether Campbell had implicated the defendant — despite having been expressly instructed to consider only the evidence introduced at trial and not to speculate as to the reasons for the absence of the alleged coventurers — such discussion or speculation as to matters they were instructed to disregard would not constitute extraneous influence on the jury, and it must be presumed (and the defendant made no showing to the contrary) that the jury heeded the judge's instructions, which they in fact repeatedly affirmed. See *Fidler, supra* at 198-199.

dant's claim that his trial attorney was prejudicially ineffective in introducing evidence of his criminal record and in failing to put in evidence the gas chromatograms produced by the Commonwealth's testing of the fire scene samples (but not introduced by the Commonwealth). Since the defendant chose to testify, the Commonwealth was permitted to cross-examine him regarding his criminal record, and counsel adopted a reasonable strategy of defusing its impact, see *Commonwealth* v. *Coviello*, 378 Mass. 530, 534 (1979), and using it to create a sympathetic portrait of the defendant as a troubled young man who was the product of an abusive and distressing childhood, which had led him into conflict with both school authorities and the law, but who had turned his life around by the time of the crimes with which he was charged.

Although counsel's failure to introduce the gas chromatograms appears to have been an oversight, it was not a failing "so grave, so fundamental, that 'the trial cannot be [said to have] . . . produced a just result.' " *Commonwealth* v. *McGann*, 20 Mass. App. Ct. 59, 61 (1985), quoting from *Strickland* v. *Washington*, 466 U.S. 668, 686, reh'g denied, 467 U.S. 1267 (1984). Even without that material, trial counsel elicited substantial evidence through the defendant's expert and cross-examination of the Commonwealth's chemist to raise questions as to the quality and validity of the Commonwealth's testing of the fire samples, and his questioning clearly reflected his having educated himself about the scientific testing at issue in the case. In addition, he used the Commonwealth's failure to introduce the gas chromatograms to the defendant's benefit by stressing their inadequacies in his closing. Finally, as noted earlier, the defense rested chiefly on alibi and misidentification, not on a claim that the fire had been a product of accident rather than arson. On a view of the entire case, it cannot be said that counsel's challenged failure to introduce evidence would have "accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

Accordingly, for the reasons set forth above, we affirm the judgments of conviction and the order denying the defendant's motion for a new trial.

*So ordered.*