## COMMONWEALTH *vs.* ANTHONY OLSZEWSKI, THIRD.

Hampden. October 4, 1993. - December 30, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Homicide. Practice, Criminal*, Disclosure of evidence, Preservation of evidence, Loss of evidence by prosecutor, Comment by prosecutor, Argument by prosecutor, Capital case. *Evidence*, Redirect examination, Admissions and confessions, Failure to produce witness. *Jury and Jurors. Constitutional Law*, Jury.

At the retrial of an indictment for first degree murder, a belt found at the site of an apparent assault on the victim, misplaced by the Commonwealth prior to the defendant's first trial and discovered six years later prior to his second trial, was admissible where the defendant did not establish a reasonable possibility, based on concrete evidence and not on mere speculation, that the Commonwealth's actions deprived him of evidence that would have been favorable to his case. [713-715]

At the trial of an indictment for first degree murder involving a witness who, while at the police station, had destroyed a written statement providing an alibi to the defendant and who then gave a second statement describing the defendant's confession in detail, the judge correctly concluded that law enforcement officials' improper conduct in allowing the statement to be destroyed was not so egregious as to warrant dismissal of the indictment where, because the general contents of the statement were known and defense counsel was permitted to cross-examine fully concerning its making and destruction, the loss did not seriously impair the defense. [715-717]

At a murder trial, certain photographic evidence was properly admitted for the purpose of rehabilitating a Commonwealth witness. [717-718]

At a murder trial, evidence of the defendant's silence when asked, two weeks after the murder by a close friend, "Why did you do it?," was properly admissible as an adoptive admission. [718-719]

In the circumstances of a murder trial, the defendant demonstrated no violation of his federally protected rights nor any prejudice in the judge's excusal from service before the commencement of testimony of one of sixteen empanelled sequestered jurors based on demonstrated extreme hardship, without a hearing and out of the defendant's presence, where it was reasonably apparent from the record that the defendant

would have agreed with the discharge had a hearing been held. [720-722]

In a murder case, the judge correctly concluded that a proper foundation had been laid for the prosecutor to comment on the defendant's failure to call two witnesses (his father and his sister) who were available to testify. [722-725]

At a criminal trial certain improprieties in the prosecutor's closing argument that the judge promptly and forceably instructed the jury to disregard did not provide a basis for the grant of a new trial. [725-727]

No reason appeared in the record of a murder trial to warrant the grant of a new trial under G. L. c. 278, § 33E. [727-728]


INDICTMENT found and returned in the Superior Court Department on March 2, 1982.

Following review by this court, 401 Mass. 749 (1988), the case was retried before *John F. Moriarty*, J., and a motion for a new trial was heard by him.

*James A. Couture* (*Charles K. Stephenson* with him) for the defendant.

*Brett J. Vottero*, Assistant District Attorney (*Elizabeth Dunphy Farris*, Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. In *Commonwealth* v. *Olszewski*, 401 Mass. 749 (1988), we reversed the defendant's conviction of murder in the first degree and ordered a new trial. A jury in the Superior Court again convicted the defendant of murder in the first degree by reason of extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant appeals from the judgment of conviction and the denial of his motion for a new trial. The defendant argues numerous errors which he maintains necessitate dismissal of the indictment or a third trial. He also contends that he is entitled to a new trial after consideration of the entire case under G. L. c. 278, § 33E (1992 ed.). We discern no error which would require a third trial and no basis for relief under § 33E. Accordingly, we affirm the defendant's conviction of murder in the first degree and the order denying his motion for a new trial.

Viewing the evidence in the light most favorable to the prosecution, see *Commonwealth* v. *Martino*, 412 Mass. 267, 269 (1992), the jury could have found the following facts. The defendant and the victim had dated for approximately two years prior to the victim's murder on the night of January 28, 1982. Their relationship had broken off early in January, and the victim had just begun dating another man. The defendant was upset about this. On January 28, in the presence of several of his friends, the defendant threatened to kill the victim.

On that same day, the victim told family members and co-workers that she was going to stop at the defendant's house after work to retrieve items and money she had loaned to him. She intended to return home for dinner and expected her new boy friend to call her at home to arrange a date for that evening. She stopped at the defendant's home and retrieved her belongings from him. She never returned home.[1]

On the afternoon of January 29, on Great Plains Road, a remote area in West Springfield, the local building inspector discovered red stains on the snowy road, two women's shoes (later identified by the family as the victim's), and a strip of chrome. Police officers investigating the site later found two earrings, identified as belonging to the victim, two teeth, and in a tree, a belt hanging over six feet off the ground.

Later in the day, the victim's frozen body was discovered in the mouth of a culvert passing under Shaker Road in Westfield (a city adjoining West Springfield) approximately seven miles from the Great Plains Road site. She had suffered fractures to her upper and lower jaws and her pelvis, and abrasions and bruising on her head, face, neck, and trunk. Several teeth were missing from her jaw, and the teeth found at the West Springfield site appeared to fit into the resulting gaps. There was significant internal hemorrhag-

[1]Several witnesses testified to seeing the victim around 8 P.M. on January 28, alone and alive. These witnesses were effectively impeached by the prosecution, and the jury reasonably could have concluded, as to two of these witnesses, that they did not see the victim, and as to another, that she saw the victim on an evening other than January 28.

ing in the areas of the head, neck, and chest, as well as evidence of strangulation. Some of her injuries were consistent with blows from a fist or a foot. The injuries might not have been immediately fatal, and the victim might have been alive when her body was left by the side of the road.

In the early morning hours of January 30, the victim's automobile was discovered in a parking lot adjacent to a bowling alley in Westfield with a bloodstain on the floor in the back seat and hairs consistent with the victim's and fibers consistent with her coat on its undercarriage. A strip of chrome trimming was missing from the passenger side of the automobile.

The defendant's defense was alibi.[2] The defendant admitted that the victim came to his house on January 28 to pick up her belongings, but maintained that she had left around 6:30 P.M. He told the police that he was·in the company of Philip Strong between 7 and 9 P.M. He met other friends around 9 P.M., spending the remainder of the evening in a bar with one of them before returning home.

Several of his acquaintances testified to seeing him at various times during the evening of January 28. Strong initially corroborated the defendant's account of his activities between 7 and 9 P.M., the crucial period in the view of the Commonwealth. Some two weeks later, on February 15, Strong changed his story and provided the police with a statement that became the centerpiece of the Commonwealth's case against the defendant. Strong told the police that he had not been with the defendant on January 28, but had been with the defendant on January 29, on which occasion the defendant confessed to murdering the victim. Strong testified that the defendant stated that he had choked the victim with his hands, wrapped a belt around her neck and dragged her from her automobile, stamped on her neck with the heel of his shoe, then run her over several times with the

---

[2]The defendant did not testify at his second trial. The jury heard testimony from a police officer as to a statement made by the defendant describing his activities during the evening of January 28.

vehicle. When she became stuck underneath the automobile, he pulled her out, threw her in the back seat, and drove to Westfield, where he threw her out of the automobile. The defendant then drove the automobile to a parking lot adjacent to a bowling alley in Westfield, where he abandoned it. From a gasoline station across the street, the defendant called his father, who picked him up and drove him home.

Along with evidence of motive and opportunity, evidence of consciousness of guilt bolstered the defendant's confession. On January 29, hours before the victim's body was found, the defendant made a telephone call to one of the friends to whom he had made remarks threatening the victim on January 28, and told the friend that he had been "only kidding" about killing the victim. David St. Onge, another friend, testified that, approximately two weeks after the murder, the defendant drove to St. Onge's house. Asked by St. Onge, "Why did you do it?," the defendant remained silent, and left the house without a reply. The belt found at the Great Plains Road location, which was the same length as a belt seized from the defendant when he was arrested, was the only physical evidence introduced by the Commonwealth which appeared to link the defendant to the murder.

Additional facts will be discussed as they bear on the defendant's claims of error.

1. *Pretrial motions for dismissal of indictment or suppression of evidence.* The principal ground on which the defendant's first conviction was reversed was that certain evidence had been lost or destroyed prior to trial. The defendant was thus deprived of the opportunity to conduct tests on the lost items which might have provided exculpatory evidence.[3] Also lost or destroyed were police interview notes with several wit-

---

[3]Items of physical evidence either lost or destroyed were identified as: (1) the belt found at Great Plains Road; (2) a blood sample taken from the red stain in the center of Great Plains Road; (3) blood samples taken from snow underneath the victim's automobile in the bowling alley parking lot; (4) a paint chip taken from the victim's skin; (5) a glass shard taken from the victim's skin; (6) a blood-soaked carpet swatch removed from the victim's automobile; (7) an automobile window crank handle recovered from the victim's automobile; and (8) a plastic cup lid found in the vic-

nesses who testified that they had seen the defendant on the evening of January 28,[4] and the first written statement given to the police by Philip Strong, which provided the defendant with an alibi. *Commonwealth* v. *Olszewski, supra* at 753, 755.

On remand, we directed: "[T]he judge, on proper showing by defense counsel that the lost or destroyed evidence is potentially exculpatory, must undertake the weighing test set forth in [*Commonwealth* v. *Willie*, 400 Mass. 427; 432-433 (1987)]. For each piece of missing evidence shown to be potentially exculpatory, the judge must weigh the culpability of the Commonwealth and its agents, the materiality of the evidence, and the potential prejudice to the defendant" (footnote omitted). *Commonwealth* v. *Olszewski, supra* at 757. Shortly before such hearings were to begin, the judge learned that at least some of the missing evidence had been found.[5]

_____

tim's automobile. *Commonwealth* v. *Olszewski*, 401 Mass. 749, 752-753 (1988).

[4]These witnesses were Harold Foley, his son, Paul Foley, and Dorian Black. Harold Foley died before the defendant's second trial. Paul Foley and Dorian Black testified for the defense at the second trial. Both testified that they had seen the defendant at a Mobil gasoline station between, approximately, 6:30 and 7:30 P.M. on January 28. Based on their testimony during cross-examination, the jury could have concluded that Foley and Black had seen the defendant on January 27, and not on January 28. When describing his activities on January 28 to the police, the defendant did not mention seeing Foley and Black, and their testimony was inconsistent with the defendant's statement that he had spent the hours between 7 and 9 P.M. in Philip Strong's company.

In findings prepared at the conclusion of the pretrial hearings, the judge noted that police officers had interviewed Harold Foley, Paul Foley, and Dorian Black before focusing on the defendant as a suspect, and had not questioned them about the defendant's whereabouts on January 28. The judge concluded, therefore, that the loss of these notes did not deprive the defendant of exculpatory evidence.

[5]A chemist employed by the State police crime laboratory had placed evidence collected in the investigation of the victim's murder in a "drying hood." Some of this evidence was packaged and stored with evidence from another case, the "Renda case," which was not going to trial because the individual accused was not competent to stand trial. In 1984, the individual accused in the Renda case was judged competent to stand trial, and physical evidence related to that case was removed from storage. When the evidence was examined, it was discovered that some of the evidence related

He therefore "allowed the defendant's counsel to conduct what might be called an omnibus discovery hearing in an effort to determine as precisely as possible what evidence had been available during the investigation of [the victim's] murder, what had happened to any of that evidence that is not presently available; and what, if any, prejudice the defendant might suffer as a result of the loss or destruction of any evidence."

After evaluating extensive testimony from law enforcement officials and other witnesses, the judge made exceedingly comprehensive and careful findings of fact concerning the status of the evidence in the case, which are fully supported by the evidence and which we accept. (The judge's memorandum is 124 pages in length.) In response to the defendant's motion to dismiss the indictment, or, in the alternative for suppression of evidence, the judge concluded that certain evidence, noted in the margin, should be suppressed.[6] He denied so much of the defendant's motion as sought suppression of additional evidence and dismissal of the indictment. The defendant maintains that the Commonwealth's

---

to the murder of the victim in this case had been placed in storage with the Renda case evidence. Recovered evidence consisted of the belt, the blood-stained carpet swatch from the victim's automobile, the plastic drink lid, the window crank handle, and a blood sample from the victim obtained at the autopsy. The chemist told his superior of the rediscovery of the evidence in 1984, but the district attorney's office and the defendant's attorneys were not informed that the evidence had turned up until May, 1988, several months after the defendant's first conviction had been reversed by this court.

[6]The judge concluded that the Commonwealth had violated a pretrial conference agreement to allow inspection by the defendant of material, relevant physical evidence, see *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 746-749 (1986), by destroying certain physical evidence through the process of testing. He ordered suppressed all evidence of the results of tests on the red stains found at Great Plains Road and of the stained snow scraped up from beneath the victim's automobile in the bowling alley parking lot. In *Commonwealth* v. *Olszewski, supra* at 757, it was stated that, at the defendant's first trial, a chemist testified that the belt showed traces of blood. Although the judge noted that he had heard no testimony during the lengthy pretrial hearings that signs of visible or occult blood ever were discovered on the belt, he ordered that any such evidence be suppressed.

mishandling of the evidence required dismissal of the indictment, or, at a minimum, suppression of the belt and any evidence derived from it, and of Philip Strong's testimony in its entirety. We disagree.

(a) *The belt.* Testimony from law enforcement officials as to the discovery of the belt, the belt itself, and a photograph of the belt, laid beside a belt seized from the defendant when he was arrested, were admitted at trial. A State trooper testified that he tested the belt recovered from the Great Plains Road site for fingerprints several days after the murder, with negative results. He further testified that the belt's surface was a material that would be unlikely to retain fingerprints. The defendant argues that the belt should have been suppressed because the Commonwealth's negligence kept the belt from him for approximately six years, depriving the defendant of the opportunity to conduct (unspecified) tests that might have tended to prove the belt was not his.[7]

A defendant claiming to have been deprived of potentially exculpatory evidence has the initial burden of establishing a reasonable possibility, based on concrete evidence and not on mere speculation, that the Commonwealth's actions deprived him of evidence that would have been favorable to his case. See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 414 (1991); *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). It was suggested previously that the belt might be a source of potentially exculpatory evidence because fingerprint testing or wear marks might point to ownership by a third person. *Commonwealth* v. *Olszewski, supra* at 757. With the recovery of the belt (with wear marks intact), and uncontradicted testimony as to the lack of fingerprints, these possibilities can

---

[7]On appeal, the defendant also argues that the belt should have been excluded as irrelevant. Strong testified that the defendant confessed to having wrapped his belt around the victim's neck and using it to pull her from her vehicle. The forensic pathologist called by the prosecution testified that one of the marks on the victim's neck could have been caused by the belt. The presence of a belt at the probable scene of the murder tended to corroborate Strong's account of the defendant's confession. The belt was obviously relevant. See *Commonwealth* v. *D'Ambra*, 357 Mass. 260, 263-264 (1970).

be discarded. When the belt, along with other evidence, was recovered, all of the evidence was examined exhaustively by experts for both parties. Although no physical evidence was discovered that linked the defendant to either the Great Plains Road site or the Shaker Road site, no evidence was discovered suggesting the presence of a third party, or the involvement in the murder of any vehicle other than the victim's white automobile. The defendant does not offer any concrete evidence, or even an imaginative suggestion, as to what evidence might have been lost during the belt's lengthy sojourn in the State police crime laboratory. Delay alone, even when it is attributable to the Commonwealth's negligence, does not entitle the defendant to a presumption that potentially exculpatory material evidence has been lost. The judge properly ruled that the belt was admissible.

We do not mean to suggest that the loss of the evidence from this case, and the failure immediately to disclose its recovery, was excusable. As a remedy, the defendant was entitled to bring to the jury's attention the Commonwealth's negligent handling of the physical evidence. This was done. The judge permitted extensive cross-examination as to the methods of investigation and procedures (or lack thereof) for the preservation of evidence. The defendant's rights were adequately protected.

(b) *Strong's first statement.* Strong's first statement to the police, written by him on a single piece of paper, provided an alibi to the defendant between the hours of 7 and 9 P.M. on January 28. No witness was able to recall the precise language or the details of this statement. Some two weeks after he furnished his initial statement, Strong returned to the police station. After initially insisting his first statement was true, Strong began to waver. Left alone in a room with his first statement, he tore it up and placed it in a wastepaper basket. He then dictated his second statement which described the defendant's confession in detail.

The judge found that law enforcement officials had deliberately left Strong alone with his first statement hoping he would destroy it, knew at the time that he had destroyed it,

and made no effort to retrieve it. The judge considered this conduct to be "incredibly foolish," but concluded that "it did not amount to a bad faith effort to deprive the defendant of exculpatory evidence,"[8] and did not warrant dismissal of the indictment. As had been done at the first trial, the defense was allowed to describe to the jury the circumstances of the making and destruction of Strong's first statement, and thoroughly to cross-examine Strong and the law enforcement officers with regard to its contents. The judge also instructed the jury that, if they believed that the police destroyed or participated in the destruction of any statement of any witness, they could infer that the destroyed statement contained material unfavorable to the Commonwealth's case. The defendant argues that these safeguards did not sufficiently punish the Commonwealth for the acts of its agents. We disagree.

When a defendant is deprived of potentially exculpatory evidence by the actions of the Commonwealth, "a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendant." *Commonwealth* v. *Willie, supra* at 432. See *Commonwealth* v. *Phoenix, supra* at 412; *Commonwealth* v. *Troy,* 405 Mass. 253, 261 (1989). Measured by this standard, Strong's testimony was properly admitted. Strong's first statement was material and exculpa-

---

[8]The defendant argues vehemently that the finding of no bad faith cannot be reconciled with the subsidiary facts found by the judge and that the only logical conclusion to be drawn from the police officers' actions is that they intentionally destroyed evidence favorable to the defendant to strengthen (or perhaps even to manufacture) their case against him. We think otherwise. The judge concluded that the police were genuinely convinced that Strong's first statement was false. The statement opened Strong up to potential criminal liability as an accessory after the fact to murder, something of which the police must have been aware. It fairly can be inferred that the police turned a blind eye to the destruction of the statement (the only evidence of Strong's complicity in the murder) in return for an accurate account of Strong's activities on January 28 and 29. They did not consider the value of the first statement for impeachment purposes.

tory, *Commonwealth* v. *Olszewski, supra* at 758, and had value as impeachment material. However, because the general contents of the destroyed statement were known, and defense counsel was permitted to cross-examine fully concerning its making and destruction, its loss did not seriously impair the defense. Cf. *Commonwealth* v. *Sasville,* 35 Mass. App. Ct. 15, 28 (1993) (dismissing indictment where destruction of potentially exculpatory impeachment evidence deprived defendant of meaningful opportunity to cross-examine complainant). Dismissal of an indictment is a remedy that infringes "severely on the public interest in bringing guilty persons to justice." *Commonwealth* v. *Cinelli,* 389 Mass. 197, 210, cert. denied, 464 U.S. 860 (1983). Faced with misconduct more serious than that present in this case, we have concluded that a criminal complaint should not be dismissed. See *Commonwealth* v. *Light,* 394 Mass. 112, 114 (1985) (declining to dismiss complaint based on police department's deliberate failure to disclose material physical evidence so exculpatory that it "might well have ended the case with a finding of not guilty"). While certainly improper, the Commonwealth's conduct in this case was not sufficiently egregious, see note 8, *supra,* to warrant dismissal of the indictment.[9]

2. *Admission of evidence.* (a) *Photographs of Strong's child.* Strong testified that he had delayed going to the police to retract his first statement because his fiancée gave birth to their child on February 1. According to Strong, the child was born with serious health problems, and her birth immediately made demands on his time. Defense counsel recalled Strong to the stand (in effect for cross-examination) and impeached him on this issue with hospital records tending to show that the child's problem (sudden infant death syndrome) was not diagnosed until February 26, long after Strong told the police of the defendant's confession. The prosecution was al-

---

[9]In view of the importance of Strong's testimony to the prosecution, suppression of that testimony would most likely result in dismissal of the indictment. Thus, we do not consider separately the defendant's request that Strong's testimony be suppressed in its entirety.

lowed to rehabilitate Strong with photographs, taken shortly after birth, showing the infant in a hospital incubator. The defendant argues that admission of these photographs was prejudicial error, despite their collateral nature, because Strong's credibility was an essential issue at trial.

The scope of redirect examination is a matter within the discretion of the trial judge, reviewed only for an abuse of discretion. *Commonwealth* v. *Maltais*, 387 Mass. 79, 92 (1982). "It is well established that a witness may explain, modify, or correct damaging testimony that was elicited on cross-examination." *Commonwealth* v. *Mandeville*, 386 Mass. 393, 400 (1982). Defense counsel properly, and effectively, impeached Strong's credibility with his child's hospital records. The prosecution was entitled to rehabilitate him and admission of the photographs for this purpose was well within the judge's discretion.[10]

(b) *Testimony of David St. Onge.* After a thorough voir dire, the judge ruled admissible as evidence of a possible adoptive admission the testimony of David St. Onge, who testified that the defendant remained silent when asked, some two weeks after the victim's murder, "Why did you do it?" On appeal, the defendant renews his challenge to the admissibility of this testimony. We conclude that its admission was within the judge's discretion.

"Where a party is confronted with an accusatory statement which, under the circumstances, a reasonable person would challenge, and the party remains silent or responds equivocally, the accusation and the reply may be admissible on the theory that the party's response amounts to an admission of the truth of the accusation." *Commonwealth* v. *Mac-*

---

[10]The judge properly ordered redacted the statement in the child's medical records that Strong "appeared bored" during a training session on use of a child monitor. General Laws c. 233, § 79 (1992 ed.), establishes the admissibility of hospital records related to *treatment and medical history* as an exception to the hearsay rule. *Commonwealth* v. *Dunne*, 394 Mass. 10, 17 (1985). The note concerning Strong did not relate to the treatment and medical history of his child. No other exception to the hearsay rule is identified as a basis for admission of this portion of the record.

*Kenzie*, 413 Mass. 498, 506 (1992). See *Commonwealth* v. *Jones*, 400 Mass. 544, 547 (1987); *Commonwealth* v. *Brown*, 394 Mass. 510, 515-516 (1985). Because of the inherent ambiguity of silence in the face of an accusation, evidence of this nature must be approached with caution. *Commonwealth* v. *MacKenzie, supra.* As foundation for the evidence, it must be apparent that the party has heard and understood the statement, that he had an opportunity to respond, and that the context was one in which he would have been expected to respond to an accusation.

It was established during voir dire that the victim's murder was a regular topic of conversation among a group of young people who frequently saw one another, including St. Onge, the defendant, and, before her death, the victim. The defendant, therefore, could be expected to understand that St. Onge, with whom the defendant and the victim used to double date, was accusing him of the victim's murder. The defendant's actions, as testified to, tended to confirm that he understood the statement to be accusatory. St. Onge was a close friend of the defendant, and not a casual acquaintance. (They generally saw one another five to six times a week.) The defendant, who had an opportunity for response, reasonably could be expected to deny the accusation of a friend who would have preferred not to think him guilty. Cf. *Commonwealth* v. *MacKenzie, supra* at 507 n.8. St. Onge's testimony was properly admitted.[11]

_____

[11]Contrary to the defendant's assertion, the judge was not obligated to give a limiting instruction regarding the proper use of St. Onge's testimony when defense counsel twice requested that he not do so. Counsel was entitled to make that strategic choice and to have it respected. *Commonwealth* v. *Montanino*, 409 Mass. 500, 507 n.5 (1991), is not to the contrary. The defendant's assertion that this testimony "smacked of recent contrivance" goes to the credibility and weight of the evidence. Those are matters reserved for the jury. *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992). *Commonwealth* v. *Nardone*, 406 Mass. 123, 129 (1989). The defense brought to the jury's attention the fact that St. Onge had not discussed this encounter with the police until shortly before the defendant's second trial, some eight years after the murder.

3. *Dismissal of a juror.* The facts giving rise to this claim of error are as follows. The jury were empaneled in Pittsfield in Berkshire County for sequestration in Springfield in Hampden County. The judge inquired of prospective jurors whether sequestration would be a hardship. One prospective juror claimed financial hardship, and then stated that his wife's medical situation required that she use an oxygen tank and he would have to get someone to stay with her. The juror remained in the venire and was subsequently empaneled as one of sixteen jurors.[12] When jury selection was complete, the judge, the defendant, and counsel left Pittsfield, intending to reassemble in Springfield the next morning for the commencement of trial. Court officers accompanied the jurors to their homes to collect personal effects in anticipation of sequestration.

Before the judge returned home, a court officer had telephoned; the judge returned the call and learned by telephone that, when the juror arrived home, his wife became distraught at the prospect of being left alone, insisting that she needed her husband. The juror refused to leave her, and there did not appear to be anyone else available to stay with her. The juror's son had telephoned from the eastern part of the State and insisted that his mother could not be left alone. The judge telephoned the wife's physician, who confirmed that the juror's wife could not safely be left alone. The judge excused the juror from further service based on hardship. The next morning, he informed counsel of this development. The judge subsequently denied the defendant's motion for a new trial based on the juror's discharge, concluding that, if the discharge "was an error . . . it was [not] an error of constitutional dimension and . . . [not] of sufficient magnitude to warrant a new trial."

The defendant claims that a new trial is required, because the judge's decision to discharge the juror without consulting the defendant violated his Federal constitutional right "to have his trial completed by a particular tribunal." *United*

---

[12]Fourteen jurors remained when the case was submitted to the panel.

*States* v. *Jorn,* 400 U.S. 470, 480 (1971), quoting *Wade* v. *Hunter,* 336 U.S. 684, 689 (1949). Federal case law does not support the defendant's contention. As two commentators have observed: "[T]he judge's action in excusing a juror [prior to deliberations] will be upheld 'if the record shows some legitimate basis for his decision.' [*United States* v. *Peters,* 617 F.2d 503, 505 (7th Cir. 1980).] This is because the defendant has still been tried by 12 persons selected by him, with even those originally designated as alternates being selected in the same fashion as the other jurors." (Footnotes omitted.) 2 W.R. LaFave & J.H. Israel, Criminal Procedure § 21.3, at 742 (1984). See *United States* v. *Rodriguez,* 573 F.2d 330, 332 (5th Cir. 1978); *United States* v. *Florea,* 541 F.2d 568, 572-573 (6th Cir. 1976), cert. denied, 430 U.S. 945 (1977); 2 C.A. Wright, Federal Practice and Procedure § 388 (2d ed. 1982). The defendant participated in the selection of sixteen jurors, of whom the juror above was one, and declared himself satisfied with the panel. The record demonstrates that requiring service of the juror would have caused extreme hardship, unquestionably a legitimate basis for discharge. Cf. *United States* v. *Gay,* 522 F.2d 429, 435 (6th Cir. 1975) (abuse of discretion to discharge juror for hardship where no record of reasons existed). See *United States* v. *Florea, supra.* There was no violation of the defendant's federally protected rights.

The defendant also argues that the failure to conduct a hearing prior to discharging the juror violated the requirement of G. L. c. 234A, § 39 (1992 ed.), that a hearing be held in the defendant's presence prior to the discharge of a sworn juror for reasons of hardship.[13] We agree that the discharge of the juror without a hearing did not comport with the requirement that the defendant be present,[14] but con-

---

[13]In relevant part, G. L. c. 234A, § 39 (1992 ed.), provides: "The court shall have authority to excuse and discharge an impanelled juror prior to jury deliberations after a hearing upon a finding of extreme hardship."

[14]It is understandable that the judge did not conduct a hearing prior to discharging the juror. The judge was at home when he learned of the problem. A prompt discharge of the juror was imperative. The parties had left

clude that no prejudice resulted from the error. See *Commonwealth* v. *Robichaud*, 358 Mass. 300 (1970).

Defense counsel had already requested that the judge inquire further of jurors seeking to be excused based on hardship out of concern that these individuals might not give their full attention to the case. The juror's situation obviously called for his discharge. In view of the concern the defense had expressed about the attitude of other jurors seeking discharge based on hardship, it is also obvious that the defendant would not have opposed excusing the juror. Defense counsel "object[ed] [for the record] to the excusing of a juror outside of the presence of [the defendant]," but expressed no particular concern, and did not move for a mistrial, or request empanelment of an additional juror or any other remedial measure. We decline to presume prejudice when the only feasible course was discharge of the juror, no remedial measures were sought, the discharge occurred prior to opening arguments, and it is reasonably apparent from the record that the defendant would have agreed to this course had a hearing been held.[15]

4. *The prosecutor's remarks on the failure to call two witnesses.* Over objection, the prosecutor sought and received permission from the judge to comment during closing argument on the defendant's failure to call to the stand his father and his sister, both of whom might have contradicted certain aspects of Strong's testimony. Strong testified that, as part of his confession, the defendant stated that his father had given him a ride home from the gasoline station across the street

---

Pittsfield where the jury had been empaneled, and could not have reassembled easily for a hearing. An attempt should have been made to contact the parties by telephone, but the judge may not have had the statutory requirement available to him at home.

[15]Cases concerning the discharge of a deliberating juror are not relevant to the problem that arose in this case. The risk, at that crucial stage of a trial, is that a juror may seek discharge based on hardship or illness when his opinion as to the defendant's guilt is not in accord with the opinions of the other jurors. See *Commonwealth* v. *Connor*, 392 Mass. 838, 843 (1984) ("Great care must be taken to ensure that a lone dissenting juror is not permitted to evade his responsibilities").

from the bowling alley in Westfield after the defendant had disposed of the victim's body. Strong also testified that the defendant's sister came to see him, and asked him what he had told the police. Strong described to her the substance of his first statement to the police, and made her a diagram (admitted in evidence) of where he told the police he and the defendant had parked their cars between 7 and 9 P.M. on January 28. Strong further testified that, although he told the defendant's sister what he first told the police, he also told her that her brother had killed the victim. It is undisputed that the defendant's father and sister were in the courtroom during the trial and available to the defense as witnesses. The defendant argues that it was erroneous to permit comment by the prosecutor.[16] We conclude that circumstances warranting comment on the failure to call the defendant's father and sister were present in this case.[17]

"Where incriminating evidence has been introduced by the Commonwealth and explanations consistent with his innocence could be produced by the defendant through witnesses other than himself, his failure in this respect may be deemed by the judge to be fair matter for comment." *Commonwealth*

---

[16]The prosecutor commented to the jury:

"[L]adies and gentlemen, his father has been here for two weeks sitting here watching this case. You can infer by the fact that he didn't get up and tell you that he didn't pick him up, didn't pick up his son, you can infer from that, ladies and gentlemen, that he did pick up his son in Westfield. . . .

"The defendant's sister didn't testify in this case. Phil Strong says, 'I told his sister that he killed her, and she started crying.' And she's here, ladies and gentlemen. And did she come in and say, 'Oh, no, he never said that . . .'? You didn't hear from her."

[17]The need for caution in permitting comment on witnesses not called by the defendant has been noted with regularity. See *Commonwealth* v. *Niziolek*, 380 Mass. 513, 518 n.2 (1980); *Commonwealth* v. *Franklin*, 366 Mass. 284, 294 (1974); *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134-135 (1986). The judge engaged in a thorough colloquy with counsel, and took appropriate factors into account, before ruling that the prosecutor could comment on the defendant's failure to call certain witnesses. We are satisfied that the judge approached the question carefully and with due regard for the rights of the accused.

v. *Franklin*, 366 Mass. 284, 293-294 (1974). See *Commonwealth* v. *Bryer*, 398 Mass. 9, 12 (1986); *Commonwealth* v. *Niziolek*, 380 Mass. 513, 519 (1980). Factors that must be considered before comment is permitted include the strength of the case against the defendant, and whether, if innocent, he would be expected to call the witnesses, *Commonwealth* v. *Bryer, supra*; *Commonwealth* v. *Finnerty*, 148 Mass. 162, 167 (1889), and the importance of the witnesses' testimony to the defense. *Commonwealth* v. *Niziolek, supra* at 520. Comment is not permissible if it appears that the evidence would be merely cumulative, corroborative of other testimony, or peripheral to the question of innocence. *Commonwealth* v. *Schatvet, supra* at 134, and cases cited.[18]

The linchpin of the Commonwealth's case was Strong's account of the defendant's confession. The confession carried

---

[18]The defendant argues that an error in the judge's instructions on the inference that could be drawn from a party's failure to call a witness compounded the error of permitting comment by the prosecutor. Each party commented to the jury on the other party's failure to call certain witnesses. The judge gave a general instruction on missing witnesses, without naming any particular witness, which was correct as far as it went. We agree with the defendant that the jury should have been instructed that, as to the defendant, whether such an inference should be drawn is dependent on the strength of the government's case, and that the jury should not draw an adverse inference from the defendant's failure to call a certain witness unless they were persuaded of the truth of the inference beyond a reasonable doubt. See *Commonwealth* v. *Niziolek, supra* at 519-520, 522. No objection to the charge was made below. Accordingly, "our review is limited to whether the error created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 509 (1992). It did not.

The jury were instructed that the Commonwealth had the burden of proving the defendant's guilt beyond a reasonable doubt. They were instructed generally that jurors may draw an inference only if the basic facts from which the inference is drawn are proved beyond a reasonable doubt, and provided that the inference is a logical and reasonable one. It was emphasized that the defendant had a right to leave the Commonwealth to its proof and no obligation to produce evidence on his own behalf. The prosecutor's brief reference to the defendant's father and sister responded to the defense's argument that the prosecution had failed to call a witness who might have been expected to support Strong's testimony that he had not seen the defendant on January 28. The jury could not have been uncertain as to the standard they were to use in weighing Strong's testimony.

its own indicia of reliability. It tallied precisely with the victim's unusual and extensive injuries, details of which would have been unknown to anyone (aside from law enforcement officials) not involved in her murder. The confession, coupled with opportunity and motive, gave the Commonwealth a strong case against the defendant. Evidence tending to prove the confession false on a significant point would be crucial, because such evidence might cause the confession to be disbelieved in its entirety. If Strong's account of the confession were false, and the defendant were innocent, the defendant would have been expected to call his father to the stand so that he could deny picking up the defendant in Westfield on January 28.

The defendant's sister could have been expected to testify that, on February 16, Strong told her of the substance of his first statement to the police, but that he did not, as he said, also tell her that her brother had killed the victim. She could have been expected to testify, then, to an additional instance of a prior, detailed statement by Strong that was wholly inconsistent with his second statement to the police and with his testimony on the stand. Impeaching Strong's credibility was necessary to the defense. In closing, defense counsel argued at length that it was Strong's first statement that was true, and his second statement that had been fabricated. The defendant logically could have been expected to produce any testimony tending to bolster this assertion.

In discussion with the judge, the defendant offered no convincing reason why his father and his sister should not be called or why the inference should not be drawn. See *Commonwealth* v. *Franklin, supra* at 294-295. In the posture of this case, the judge could conclude that a proper foundation had been laid for comment on the defendant's failure to call his father and his sister to the stand.

5. *The prosecutor's closing argument.* At the conclusion of the prosecutor's closing argument, defense counsel objected to certain aspects of that argument, notably that the prosecutor: (1) personally vouched for Strong's truthfulness; (2) mischaracterized certain evidence; (3) referred to evi-

dence that had been excluded at trial, specifically the belief of one witness that the defendant was guilty; and (4) argued that the jury could infer consciousness of guilt from the defendant's failure to express sympathy to the victim's family after her death. The statements objected to were the subject of immediate curative instructions. It was stressed to the jury that their memory of the evidence must control. They were told to ignore any argument or testimony that they might have heard as to one of the witnesses expressing an opinion that the defendant was guilty, and to disregard the prosecutor's claim that the defendant never expressed sympathy for the victim's death. The judge subsequently denied the defendant's motion for a new trial, based on the content of the prosecutor's closing argument, concluding that the argument was not "unfair or overreaching" and that "[m]ost of the statements of which the defendant complains were of facts which were either in evidence or which could have been reasonably inferred from the evidence." The defendant maintains that the prejudice from the cumulative effect of improprieties in the prosecutor's argument was irremediable and requires a new trial. We agree with the judge that a new trial on this ground is not warranted.

"Where credibility is at issue, it is certainly proper for counsel to argue from the evidence why a witness should be believed," *Commonwealth* v. *Thomas*, 401 Mass. 109, 116 (1987), but a prosecutor should not personally vouch for the credibility of a witness. *Id.* at 114-115. However, a single "unfortunate and unartful isolated instance[] of the use[] of the first-person pronoun," *id.* at 115, in the course of a legitimate argument as to the inferences the jury should draw from the evidence does not constitute a significant error. *Id.* As we have noted, Strong's account of the defendant's confession carried its own indicia of reliability in its detailed account of the injuries inflicted on the victim. The prosecutor properly could argue that only the victim's assailant would have knowledge of the extent and kind of her injuries. Comment concerning the probable source of Strong's knowledge of those injuries was also proper.

It was improper for the prosecutor to refer to evidence that had been excluded, *Commonwealth* v. *Grimshaw*, 412 Mass. 505, 508 (1992), *Commonwealth* v. *Burke*, 373 Mass. 569, 575 (1977), and to the defendant's possible lack of remorse for the victim's death. *Commonwealth* v. *Borodine*, 371 Mass. 1, 9-10 (1976), cert. denied, 429 U.S. 1049 (1977). The judge promptly and forcefully instructed the jury to disregard these aspects of the prosecutor's closing argument, and we conclude that this was sufficient to protect the defendant's rights. *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987).

6. *Review under § 33E.* Finally, the defendant argues that he is entitled to a new trial because (a) he was coerced into standing trial while incompetent; (b) the judge abused his discretion by permitting the Commonwealth to call two police officers as rebuttal witnesses but declined to limit the scope of their testimony to issues raised on cross-examination; (c) changes in testimony and memory losses of witnesses denied him a fair trial; and (d) the cumulative effect of errors at trial (including additional alleged errors in the prosecutor's closing argument which were not objected to) resulted in the substantial likelihood of a miscarriage of justice. We see no validity to these contentions, and thus no risk of a miscarriage of justice.

(a) The record establishes that the defendant was adjudged competent to stand trial subject to restrictions tailored to accommodate his physical limitations.[19] Those restrictions were observed. The defendant expressed his desire to proceed to trial. The judge's observation to defense counsel that, by statute, see G. L. c. 123, § 15 (*a*) and (*b*) (1992 ed.), he would be obligated to commit the defendant to Bridgewater State Hospital for a period of observation if a claim of incompetency was advanced, was not coercive.

---

[19]Those physical limitations were the result of an automobile accident on February 21, 1989, in which the defendant was injured. He received a serious head injury in the accident, was in a coma for several months and sustained a measure of permanent neurological damage.

(b) The two police officers were properly called as rebuttal witnesses. The defense had focused its case on deficiencies in the police investigation into the victim's death. The testimony of the two officers did not exceed the proper scope of rebuttal evidence.

(c) Changes (most of them minor) in the testimony of certain witnesses did not result in prejudice to the defendant. A review of the record indicates that defense counsel dealt competently with the testimony of which the defendant complains. In the case of the defense witness who had lost her memory of relevant events, the judge informed defense counsel that they would be permitted to offer her testimony from the first trial. Defense counsel chose not to offer this testimony.

(d) We have carefully reviewed the entire record of the proceedings against the defendant. We discern no error requiring a new trial. The victim was murdered in a brutal and callous fashion, warranting the jury's verdict of murder in the first degree by reason of extreme atrocity or cruelty.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*