COMMONWEALTH *vs.* LEE SPENCER.

No. 98-P-2105.

Hampden. February 23, 2000. - June 8, 2000.

Present: BROWN, PORADA, & BECK, JJ.

*Practice, Criminal,* Instructions to jury. *Evidence,* Failure to produce witness, Inference, Cumulative evidence, Corroborative evidence. *Assault and Battery by Means of a Dangerous Weapon.*

At the trial of a criminal case, the judge erred in instructing the jury that they could draw an adverse inference against the defendant for his failure to call a witness, where the witness's testimony would have been only cumulative of the testimony of two other defense witnesses on the issue of the defendant's alibi and would not have been of distinct importance to his case [386-390]; the error was not harmless, where the evidence against the defendant was not overwhelming: a new trial was required [390-391].

INDICTMENTS found and returned in the Superior Court Department on August 21, 1997.

The cases were tried before *Richard F. Connon,* J.

*James Hammerschmith,* Committee for Public Counsel Services, for the defendant.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

BROWN, J. The defendant was convicted by a Superior Court jury of assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and assault and battery. On appeal, the defendant claims (1) that the trial judge erred by giving a so-called "missing witness" instruction; (2) that the judge's instruction on alibi created confusion as to the burden of proof; and (3) that the judge's instruction defining a "dangerous weapon" created a presumption against the defendant. Because we agree with the defendant that a missing witness instruction should not have been given, we reverse the convictions.

This prosecution arose from a violent attack which took place on July 15, 1997, at approximately 3:30 P.M. in the women's restroom at the Marriott Hotel in Springfield. The victim testified that she worked in the restaurant at the Marriott and had entered the restroom and proceeded to the handicap stall furthest from the door in order to change into her work uniform. She heard someone else come in the restroom and enter the stall next to hers. The other person dropped a manila folder to the ground, then picked it up. The victim noticed that the individual's hands appeared to be those of a male. Suddenly, the individual slid on his back, headfirst, under the partition which separated the two stalls, into the victim's stall. The victim testified that as the assailant slid under the partition, she saw his face for approximately two or three seconds. The assailant then stood up, and, using one hand, pinned the victim's arms behind her back. He began to punch her repeatedly with his other hand. He tried to force her head against the toilet seat, but the victim by arching her back was able to resist, and she managed to free one of her hands. The assailant remained behind the victim and continued to punch her as the struggle progressed out of the stall and into the main area of the restroom, near the sinks. At some point, the assailant began to kick the victim in the knees and the shins. By this time, the victim was screaming. The melee concluded in the main area, near the doorway, with the victim on the floor and the assailant standing over her.

Maryjane Santamaria, another employee of the Marriott, heard the victim's screams and went to investigate. When she pushed open the door to the women's restroom, she saw a man standing near the door, approximately an arm's length away. The man was looking downward, but after Santamaria entered the room he looked at her, looked downward again, made a gesture of disgust, looked back at Santamaria, then walked around her and left the area. Santamaria testified that she looked at the assailant for between four and six seconds. Santamaria left the area to call security, but then, believing that someone might be hurt in the bathroom, went back to that area, where she saw the victim. The victim was on the floor, and appeared disheveled. She had various bruises, a black eye, was bleeding, and had a fingernail nearly torn off. Santamaria, along with security personnel, searched the mall for the assailant without success. A black Sony Walkman radio was retrieved from the restroom, which the victim opined belonged to the assailant, because she had not seen it when she entered the restroom.

Later that night, the victim looked through "hundreds" of photographs at the police station. She identified several men as bearing a resemblance to the assailant, but stated that no one in the photographs was her attacker. About four days after the attack, the victim looked through over one hundred photographs, but again did not identify her assailant. After another two weeks, the victim looked through still more photos and picked out a picture of the defendant. She testified that "this one was a very strong feeling that I had and I knew it was him." The victim also identified the defendant as her attacker at a pretrial hearing, and at trial. Santamaria picked out the defendant's photo from an array of eight photographs, and she identified the defendant at the pretrial hearing and at trial.

The defendant claimed misidentification and, testifying in his own defense, stated that on the day of the attack he had been picked up at his home in Springfield by his employer's son, Jeffrey McDonough (Jeffrey) at about 6:00 A.M. He then traveled from Springfield to Norwalk, Connecticut, with Jeffrey and one Michael Kijek. After working in Norwalk, the defendant stated, he traveled, again with Jeffrey and Kijek, to Darien, Connecticut. The three concluded their work day at about 2:30 P.M. and then made the approximately two and one-half hour trip back to Springfield, where Jeffrey dropped the defendant off at his home after 5:00 P.M. The defendant testified also that his employer, Thomas McDonough (Thomas), followed Jeffrey, Kijek, and the defendant to Darien, but did not stop there.

In further support of his claim that he was working in Connecticut at the time of the assaults, the defendant presented the testimony of Thomas and Jeffrey. Thomas testified that he kept regular payroll records based upon either his observations as to how many hours each employee worked or, if he was not at a job site, information his son Jeffrey provided concerning each employee's total hours for that day. Thomas produced payroll records, which were admitted in evidence, which showed that the defendant worked eight and one-half hours on the day in question.[1,2] Thomas stated that he was not present at the Norwalk job site, nor did he follow Jeffrey, the defendant, and

[1] Thomas explained that he paid employees for their time traveling to a job site, but not for time spent returning to their homes. Therefore, by Thomas's calculations, the defendant's workday began in Springfield at 6:00 A.M., and concluded in Darien, Connecticut, at 2:30 P.M.

[2] The check to the defendant in payment for those hours was issued and

Kijek from Norwalk to Darien.

Jeffrey testified that he would customarily pick up the defendant at the defendant's home between 6:00 and 7:00 A.M. Jeffrey stated that, according to the records, he, the defendant, and Michael Kijek drove to Norwalk, Connecticut, where the three worked for five and one-half hours. Jeffrey stated that the three then went to work in Darien and completed their workday at about 2:30 P.M. Jeffrey testified that he dropped the defendant off at his home at approximately 4:30 or 5:00 P.M. On cross-examination, Jeffrey conceded that he had no memory beyond the information that the records provided. He admitted to being "pretty good friends" with the defendant.

1. *Propriety of the missing witness instruction.* The defendant's primary contention is that the judge erred in instructing the jury that they could draw an inference against the defendant due to his failure to call Michael Kijek as a witness.

> "Where a party has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that person as a witness. If, then, without explanation, he does not do so, the jury may, if they think reasonable in the circumstances, infer that that person, had he been called, would have given testimony unfavorable to the party. See *Commonwealth* v. *Finnerty*, 148 Mass. 162, 166-167 (1889); *Commonwealth* v. *Franklin*, 366 Mass. 284, 292-294 (1974); McCormick, Evidence § 272 (3d ed. 1984). There is no basis for any such inference when it appears that the testimony would be unimportant — merely corroborative of, or merely cumulative upon, the testimony of one or more witnesses who have been called."

(Footnote omitted.) *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986).

"[W]hether an inference can be drawn from the failure to call a witness depends on the posture of the particular case and the state of the evidence. See *Commonwealth* v. *Anderson*, 411 Mass. 279, 282 (1991); *Commonwealth* v. *O'Rourke*, 311 Mass.

---

cashed more than two weeks before the victim picked his photograph out of the array.

213, 222 (1942)." *Commonwealth* v. *Richardson*, 429 Mass. 182, 183-184 (1999). "Although whether to give such an instruction is, in the last analysis, a matter for the trial judge's discretion, he nonetheless 'must [first] rule, as matter of law, that there is a sufficient foundation for such inference in the record' " (citation omitted). *Commonwealth* v. *Graves*, 35 Mass. App. Ct. 76, 81 (1993), quoting from *Commonwealth* v. *Vasquez*, 27 Mass. App. Ct. 655, 658 (1989). "The strength of the case against the defendant, whether the defendant would be expected to call the witness if the defendant were innocent, and the importance of the witness's likely testimony to the defense are important considerations in determining whether an adverse inference based on the defendant's failure to call a certain witness is appropriate." *Commonwealth* v. *Thomas*, 429 Mass. 146, 150 (1999). "Comment is not permissible if it appears that the evidence would be merely cumulative, corroborative of other testimony, or peripheral to the question of innocence." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 724 (1993), cert. denied, 513 U.S. 835 (1994). "Moreover, the inference should be invited only in clear cases, and with caution, as the 'effect of the comment may be substantial in the jury's deliberations.' " *Commonwealth* v. *Matthews*, 45 Mass. App. Ct. 444, 448 (1998), quoting from *Commonwealth* v. *Franklin*, 366 Mass. 284, 294 (1974). See *Commonwealth* v. *Rodriquez*, *ante* 370 (2000); *Commonwealth* v. *Matthews*, *ante* 365 (2000).

The defendant argues that the judge's instruction on the defense's failure to call Kijek was prejudicial error both because Kijek's testimony would have been merely cumulative of the testimony of Jeffrey and Thomas and because the Commonwealth's case against the defendant was insufficiently strong to create an inference that the defendant naturally would be expected to call Kijek. See *Commonwealth* v. *Thomas*, 429 Mass. at 150-151.

It is true that Kijek could have corroborated the defendant's alibi claim. However, two witnesses (Thomas and Jeffrey) had provided testimony in support of the defendant's alibi. There is no reason to believe that Kijek's testimony would have been "anything other than 'merely corroborative of, or merely cumulative upon, the testimony of one or more witnesses who [were] called.' " *Commonwealth* v. *Keniston*, 423 Mass. 304, 314 (1996), quoting from *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. at 134. Contrast *Commonwealth* v. *Caldwell*, 36 Mass.

App. Ct. 570, 572 n.3, 581-582 (missing witness instruction proper where defendant claimed he arrived at relative's house at 3:00 A.M. — the time of the crimes — and went to sleep, and missing witness could have testified to letting the defendant into the house in the middle of the night), *S.C.*, 418 Mass. 777 (1994) (rev'd on other grounds); *Commonwealth* v. *McQuade*, 46 Mass. App. Ct. 827, 831 (1999) (missing witness instruction proper where potential testimony of missing witness was not merely cumulative of other testimony and testimony of defendant's previous witnesses "was not comprehensively exculpatory").

The Commonwealth suggests that, in addition to corroboration of the defendant's alibi, Kijek would have provided testimony clarifying whether Thomas had followed Jeffrey, Kijek, and the defendant to Darien from Norwalk (as the defendant had testified), or whether he had not followed the trio (as Jeffrey and Thomas had testified). But this potential testimony focuses on a completely collateral issue. While credibility was a crucial issue, and the prosecutor did exploit the discrepancy between the defendant's testimony and Jeffrey's and Thomas's testimony,[3] the fact remains that *Thomas's* whereabouts on the day in question was an issue "peripheral to the question of innocence." *Commonwealth* v. *Olszewski*, 416 Mass. at 724. Cf. *Commonwealth* v. *Richardson*, 429 Mass. at 184 (Commonwealth not required to call additional witness to clarify "some disagreement" between two witnesses' testimony, where witnesses agreed on crucial facts). Compare *Commonwealth* v. *Gagliardi*, 29 Mass. App. Ct. 225, 235-236, 244 (1990) (missing witness's testimony would not have been unimportant where credibility of previous witness's testimony had been "vigorous[ly] and skillfully" attacked), with *Com-*

---

[3]The prosecutor argued, "I suggest to you, ladies and gentlemen, that . . . [the defendant, Kijek, and Jeffrey] left Darien earlier than what you heard. What's a hint, what's a hint that might give you an idea that occurred? Well, yes, he [referring to Thomas] checks on us. Well, he didn't check on you that day, did he? Yes, he did. In fact, he followed us on [Route] 84. Toward our next job. Because he worked with us that morning. Oh, he did? What did you hear? From both alibi witnesses. Father never worked with them that morning. He never followed them on 84. If he was following them on 84 or if they were on 84 it's a little problematic since that's about forty miles away. They should be on 91 and 95. Can you consider that, ladies and gentlemen? Is that a little incredible? Do you think he's a little sorry that he came up with that at this stage?"

monwealth v. *Fulgham*, 23 Mass. App. Ct. 422, 426-427 (1987) (request for missing witness instruction properly denied where expected testimony would have been merely cumulative of police officer's "fresh complaint" testimony). Finally, as the defendant points out, even if Kijek had provided testimony to support the defendant's version of events, this would not necessarily have resolved the inconsistency, but may well have drawn attention to it.

Nor is this case like, for example, *Commonwealth* v. *Thomas*, 429 Mass. at 151-153. In that case, a missing witness instruction was held proper because, while the witness would not have been expected to provide complete corroboration of the defendant's whereabouts at the time of the offense, the witness could have provided at least a partial corroboration of the defendant's alibi, and the witness's testimony "could not be duplicated by the defendant's" two previous witnesses. See *id.* at 152-153. See also *Commonwealth* v. *Bryer*, 398 Mass. 9, 13 (1986) (missing witness instruction proper where defendant was sole witness for the defense, and missing witness could have provided partial corroboration of defendant's version of events); *Commonwealth* v. *Olszewski*, 416 Mass. at 722-725 (missing witness instruction proper where witnesses could have been expected to contradict prosecution witness who had testified that defendant had confessed to him).

Worthy of comment is the fact that both Jeffrey and Thomas testified that they had no memory of the day of the assaults independent of the company payroll records. The Commonwealth argues that it is speculative for the defendant to assert that Kijek should be expected to remember no more than Jeffrey or Thomas. The Commonwealth is correct. But it is equally speculative to assume, as the Commonwealth suggests we do, that Kijek would have a memory superior to that of Jeffrey or Thomas. Because the negative inference "should be invited only in clear cases," *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. at 134, the fact that we are left to speculate as to Kijek's testimony is itself evidence that the missing witness instruction should not have been given. See *Commonwealth* v. *Matthews*, 45 Mass. App. Ct. at 449 ("If the defendant could not remember definitively that he was at [his place of employment], it is unlikely that the other witnesses would have remembered"). See also *Commonwealth* v. *Groce*, 25 Mass. App. Ct. 327, 331 (1988) ("If [the defendant] couldn't

remember where he had been, it is unlikely that his mother or girlfriend would have remembered"). Cf. *Commonwealth* v. *Figueroa*, 413 Mass. 193, 199 (1992) (request for missing witness instruction appropriately denied where "[t]here was no evidence . . . that [mentally retarded potential witnesses] . . . could have been expected to give important testimony").

Nor is it controlling that Kijek may have been viewed by the jury as perhaps less biased in the defendant's favor than Jeffrey. While the prosecutor did establish that the defendant and Jeffrey socialized on a regular basis, the defendant testified that his relationship with Kijek was the "[s]ame as Jeff."[4] Whatever the case, although the defendant may have had a somewhat closer relationship with Jeffrey than with Kijek, the difference was not so significant that the defendant would have been expected to call Kijek as a witness to dispel the prosecutor's claim of bias by Jeffrey toward the defendant. Contrast *Commonwealth* v. *Thomas*, 429 Mass. at 153 (testimony of missing witness could not be considered cumulative because, while all other alibi witnesses were members of the defendant's family, missing witness was not related to the defendant: "Common sense and the case law dictate that the testimony of a blood relative of the defendant is inherently less credible than the testimony of other witnesses"). Therefore, we agree with the defendant that Kijek's testimony would not have been "of distinct importance to the case." *Commonwealth* v. *Figueroa*, 413 Mass. at 199, quoting from *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. at 134.

Nor can we fairly conclude, as the Commonwealth urges, that the error was harmless. See *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 n.7 (1999), and cases cited (discussing prejudicial error standard).

> "An inference which is unfairly urged or drawn may be decisive in the case. The failure to produce a witness may not necessarily be inconsistent with innocence of the defendant. A witness may be withheld because of his prior criminal record, or because he is susceptible to cross-examination on collateral issues, or for other tactical reasons. For the same reasons it may be tactically unwise for the defendant to offer explanation to the jury of the reasons for his failure to produce the witness . . . . All of

---

[4]Although the defendant could not spell Kijek's last name or provide Kijek's complete address, he did identify the street on which Kijek lived.

these considerations may assume added importance where the comment of the prosecutor in argument is followed by a charge by the judge which permits the inference . . . ."

*Commonwealth* v. *Crawford*, 46 Mass. App. Ct. 423, 426 (1999), quoting from *Commonwealth* v. *Franklin*, 366 Mass. at 294-295.

The evidence against the defendant, while significant, was not overwhelming.[5] The two eyewitness identifications were tempered somewhat by the fact that neither the victim nor Santamaria had more than two to six seconds to see the defendant's face. Further, both witnesses described the attacker as being approximately five feet, nine inches tall and weighing about 190 pounds, and Santamaria, who stood five feet, seven inches tall, stated that the assailant was taller than she. The defendant's height, by contrast, was between five feet, five inches and five feet, seven inches, and he weighed between 149 and 160 pounds.[6] Neither of the witnesses noticed the defendant's tattoos, despite the attacker's having worn a short-sleeved shirt. The defendant, of his own volition, went to the police station after he heard the police were looking for him, and he gave them permission to search his apartment, a search which yielded no incriminating evidence. Finally, the defendant's fingerprint expert testified that a fingerprint on the Sony Walkman radio found at the scene did not belong to the defendant.

Given the less than powerful state of the evidence, we cannot say " 'with fair assurance' that the [error] did not 'substantially sway' the outcome of the case." *Commonwealth* v. *Rosado*, 428 Mass. 76, 80 (1998), quoting from *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). Therefore, the judgments must be reversed.

---

[5]Because we conclude that Kijek's testimony was not of distinct importance to the defendant's case, we do not reach the other foundational requirement of a missing witness instruction which the defendant asserts was not present, i.e., that "the evidence against [the defendant] is so strong that, if innocent, he would be expected to call" the witness. *Commonwealth* v. *Bryer*, 398 Mass. at 12.

[6]There was conflicting evidence pertaining to the defendant's height and weight. The defendant testified that he was approximately five feet, six inches tall, and weighed about 160 pounds. An examination conducted at the Hampden County house of correction, where the defendant was held following his arrest, yielded a figure of five feet, five inches, and 149 pounds. The height indicator in the defendant's photograph from the police station showed the defendant's height to be five feet, seven inches.

2. *Other issues.* (a) The defendant takes issue with the judge's explanation of the elements of assault and battery with a dangerous weapon.[7] Although prolonged discussion of this matter is not necessary, we point out that on retrial the judge should be careful to advise the jury that the issue whether a shod foot has been used as a dangerous weapon is a question of fact for the jury to determine according to the circumstances. See, e.g., *Commonwealth* v. *Marrero*, 19 Mass. App. Ct. 921, 922 (1984); *Commonwealth* v. *Fernandez*, 43 Mass. App. Ct. 313, 315 (1997).

(b) Deciding as we do, we need not reach the question whether the judge's instruction on alibi erroneously shifted the burden of proof. However, with regard to alibi instructions, trial judges should heed the teachings of *Commonwealth* v. *McLeod*, 367 Mass. 500, 502 (1975). See also *Commonwealth* v. *Berth*, 385 Mass. 784, 788 (1982).

*Judgments reversed.*

*Verdicts set aside.*

---

[7]At one point in his instruction, the judge told the jury, "There's a statute in the Commonwealth that makes a shod foot a dangerous weapon . . . ." General Laws c. 265, § 15A, does not define the term "dangerous weapon." See *Commonwealth* v. *Sexton*, 425 Mass. 146, 149 (1997).